Shirley **LAMPTON** and Luethel Williams, individually and on behalf of their minor children, and on behalf of all other persons similarly situated, Plaintiffs,

v.

Garland L. **BONIN**, individually, and in his capacity as Commissioner of Public Welfare of the Louisiana State Board of Public Welfare; Camille Adams, individually, and in his capacity as Chairman of the Louisiana State Board of Public Welfare; John J. McKeithen, individually, and in his capacity as Governor and Ex-Officio member of the Louisiana Board of Public Welfare; Lawrence Morel, Howard Gruenberg, J. Grady Madden, Mary Lou Winters, Joseph D. Hair, Jr., John D. Sittig, and Matt Milam, Jr., individually, and in their capacities as members of the Louisiana State Board of Public Welfare; and Doris Culver, individually and as Director of the Orleans Parish Department of Welfare, Defendants.

Civ. A. No. 68–2092.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 15, 1969.

Dissenting Opinion April 21, 1969.

Jeffrey B. Schwartz, T. A., Richard A. Buckley and Robert Glass, New Orleans, La., for plaintiffs.

Jack P. F. Gremillion, Atty. Gen., William P. Schuler, 2nd, Henry J. Roberts, Jr., Asst. Attys. Gen., New Orleans, La., Horace Pepper, Gen. Counsel La. Dept. of Public Welfare, Baton Rouge, La., for defendants.

Before WISDOM, Circuit Judge, and CASSIBRY and COMISKEY, District Judges.

COMISKEY, District Judge.

This action was brought to combat an attempt by the Louisiana Department of Welfare to make a 10% reduction in Aid to Dependent Children grants because of an unexpected rise in ADC recipients and a limited ADC budget. According to Garland L. Bonin, the Commissioner of Public Welfare, the sudden rise in the ADC case load resulted from the Supreme Court's decision in King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d

1118 (1968). This ruling had the effect of compelling Louisiana to make ADC payments to families previously excluded from receiving such grants under the man in the house policy, pursuant to which payments had been withheld from families in which the parent and a member of the opposite sex were not married but either lived together as man and wife and maintained a common household, or had continuous intimate relations even if they did not maintain a common household.

Plaintiffs, two Negro mothers receiving grants under the Aid to Dependent Children program, brought this suit in the United States District Court soon after Bonin's announcement of the 10% cut. The suit was brought as a class action on behalf of plaintiffs, their children, and all other persons similarly situated. The defendants in this case are Garland L. Bonin, the Commissioner of Public Welfare of the Louisiana State Board of Public Welfare; Camille Adams, the Chairman of the Louisiana State Board of Public Welfare; John J. McKeithen, the Governor of the State of Louisiana; Doris Culver, the Director of the Orleans Parish Department of Public Welfare; and Lawrence Morel, Howard Gruenberg, J. Grady Madden, Mary Lou Winters, Joseph D. Hair, Jr., John D. Sittig and Matt Milam, Jr., who are members of the Louisiana State Board of Public Welfare. Robert H. Finch, the Secretary of Health, Education and Welfare, has also submitted a brief as amicus curiae, after being invited to do so by this Court.

In their original complaint, plaintiffs asked (1) that a three-judge court be convened; (2) that declaratory judgments be rendered in their favor declaring that the proposed 10% reduction in ADC grants and Act No. 9, Schedule 9, Item 13, Louisiana Legislative Acts, Regular Session, 1968, which prohibits reductions in Old Age Assistance grants, are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment and are invalid under Section 402(a) (23) of the Social Security Act, 42 U.S.C. § 602(a) (23); and (3) that the defendants be temporarily and permanently enjoined from reducing the amount of the payments to ADC recipients. Plaintiffs amended their complaint to ask that the Court render a declaratory judgment declaring that Act No. 9, Schedule 9, Item 13 and the 10% reduction in ADC grants are violative of Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Subsequently, in a supplemental complaint, the plaintiffs sought a declaratory judgment that Section 402(a) (23) of the Social Security Act, 42 U.S.C. § 602(a) (23), will compel a state participating in the ADC program to increase payments to ADC recipients after July 1, 1969.

A temporary restraining order was granted enjoining the defendants from putting the proposed 10% reduction into effect, which order has been extended to this date.

## I. HAS THERE BEEN A VIOLATION OF THE EQUAL PROTECTION CLAUSE?

Plaintiffs' first contention is that defendants are violating their right of equal protection of law because only ADC grants are being reduced, while payments under other assistance categories are not being reduced. Title 46 of the Louisiana Revised Statutes establishes these five general categories of public assistance: (1) Aid to the Needy Blind (ANB); (2) Disability Assistance (DA) (aid to the permanently and totally disabled); (3) Old Age Assistance (OAA); (4) Aid to Dependent Children (ADC); and (5) General Assistance (GA). Except for the General Assistance category, all of these State public assistance programs are funded in large measure with federal funds under the Social Security Act.

Act No. 9 of the Louisiana Legislative Acts, Regular Session, 1968, was an appropriations act concerning the Department of Public Welfare for the fiscal year commencing July 1, 1968, and ending June 30, 1969. The portion of this

Act, Schedule 9, Item 13, attacked by plaintiff reads in part as follows:

"Provided further that Old Age Assistance regular maximum grants of $89.00 and $83.00 shall not be cut or reduced by any amount, unless such cut or reduction is approved by the Legislature."

Plaintiffs contend that the favoring of Old Age Assistance over the other categories of public assistance is a violation of equal protection of laws. Plaintiffs also argue that the decision by the Louisiana Department of Welfare to reduce payments to ADC recipients while not reducing payments made to the non OAA public assistance recipients—the blind, the disabled, and the general assistance recipients—also deprives plaintiffs of equal protection of the laws.

Plaintiffs' argument under the Equal Protection Clause is centered upon the contention that the legislative act in question and the 10% reduction in ADC grants constitute unreasonable discriminations against needy children. The plaintiffs also raise the point that they are being discriminated against because they are mostly Negroes, but this point can be better discussed together with plaintiffs' claim that the defendants have violated Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

Plaintiffs contend that in order for Act No. 9 and the 10% reduction to be constitutionally permissible, they must be rationally related to the purpose of the Social Security Act's provisions on public assistance. The Social Security Act contains provisions on four categories of public assistance: Old Age Assistance, Aid to Families with Dependent Children, Aid to the Blind, and Aid to the Permanently and Totally Disabled. It is plaintiffs' belief that the purpose of all of these four categories can be summed up in one word: need. Thus, plaintiffs argue that the original statutes setting

up these four categories of assistance all stated that they were enacted for the purpose of furnishing financial assistance to needy individuals.

Plaintiffs go to great lengths to show that the four categories listed above are so closely related that they are in effect merely different parts of the same program. Thus, plaintiffs assert that these four categories of public assistance "are in conception, purpose and operation but one program with four groups of beneficiaries * * *."[1]

The plaintiffs then argue that since the four categories are so closely related and since their purpose is identical, the defendants deprived plaintiffs of equal protection of the laws when they prohibited reductions in Old Age Assistance grants alone and when they cut ADC grants without making similar cuts in payments to the blind and disabled public assistance recipients (plaintiffs do not center their attention upon the General Assistance category because it is not financed by Federal funds under the Social Security Act). Plaintiffs say that the purpose of the Social Security Act's provisions on all four categories is need, and there is no rational distinction between plaintiffs' needs and the needs of the other recipients of public assistance. Thus plaintiffs argue, "The essence of complainants' claims that Louisiana has deprived them of equal protection of the law is that there is no relevant constitutional distinction between the *need* of the indigent aged, the *need* of the indigent blind, or the *need* of the indigent disabled, on the one side, and the *need* of the indigent child on the other."[2]

But the fact that all of these programs are designed to relieve need is not remarkable. It is obvious that the purpose of any public assistance program is to relieve need. But this does not mean that actions done in connection with one public assistance program must be judged in

---

1. Plaintiffs' "Supplementary Pre-Trial Memorandum of Law on * * * Equal Protection as Between Adults and Children," at page 11.

2. Plaintiffs' "Memorandum of Law," at page 3. (Emphasis by the plaintiffs.)

terms of what is being done in relation to all other public assistance programs.

Furthermore, the relief of need as such is not the only statutory purpose of the non-ADC programs in question. Although the first purpose listed in the Social Security statutes setting up Old Age Assistance, Aid to the Blind, and Aid to the Permanently and Totally Disabled, is to enable the states to furnish assistance to needy individuals, there are other purposes listed in these statutes. Thus, 42 U.S.C. § 301 says that funds appropriated for Old Age Assistance are also to be used for the purposes of furnishing medical assistance to certain aged individuals who are not recipients of old age assistance and of encouraging the states to help old age assistance recipients to attain or retain capability for self-care. There are similar provisions in 42 U.S.C. § 1201, which deals with Aid to the Blind, and 42 U.S.C. § 1351, which is concerned with Aid to the Permanently and Totally Disabled.

But even more important is the fact that 42 U.S.C. § 601, which sets out the purposes for which appropriations for ADC are to be used, is different from the corresponding statutes relative to the other three categories, in that the relief of need as such is not listed as a statutory purpose. 42 U.S.C. § 601 provides:

"For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, there is authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for aid and services to needy families with children."

Thus, the primary purpose of ADC appropriations, unlike appropriations for the other three categories, is not simply to enable the states to furnish assistance to needy children. True, these funds are to be used for this purpose, but the enabling of states to furnish assistance to needy children is only a means to the real primary purpose: "the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives * * * to help maintain and strengthen family life * * *." It is not enough that dependent children be given simply financial assistance; the chief purpose of the Social Security Act section on dependent children is to see that such children are raised by their parents or relatives in a family atmosphere. Plaintiffs point out that in 1935, when the Social Security Act was enacted, the primary statutory purpose of ADC was simply to enable states to furnish financial assistance to needy children. But we must consider the Social Security Act as it exists today, not as it was written thirty-four years ago.

Furthermore, we cannot agree with plaintiffs that the four categories of public assistance found in the Social Security Act "are in conception, purpose and operation but one program with four groups of beneficiaries * * *."[3] Although the four categories may have some common provisions and objectives, each category is embodied in a separate title of the Social Security Act.[4] Each of these titles is different from the others. Each

---

3. See Note 1, *supra.*

4. Old Age Assistance and Medical Assistance for the Aged, Title I (Sections

1–6) of the Act, 42 U.S.C. § 301–§ 306; Aid to Families with Dependent Children, Title IV (Sections 401–410) of the Act, 42 U.S.C. § 601–§ 610; Aid to the

title calls for a state plan for one category only, which state plan is to be independent of the plans under the other titles. A state plan for each category must be approved by the Secretary of Health, Education and Welfare if it meets the requirements of its title. Section 404(a) of the Social Security Act, 42 U.S.C. § 604(a) provides that if the Secretary disapproves of a state plan on the Aid to Families with Dependent Children program, he must withhold federal payments to the state for that category or limit payments to parts of that particular state plan not affected by the disapproval. There is nothing in Section 404(a) which would authorize the consequences of nonconformity of this plan to be applied to any other plan.

Even more damaging to plaintiffs' argument was the enactment of Title XVI of the Social Security Act, 42 U.S.C. § 1381–§ 1385, in 1962. Up until that time it was impossible to have a common plan for any of the four categories. But then Congress enacted Title XVI, which authorized states, at their option, to have a single plan for public assistance to the aged, blind, and disabled, in lieu of the three separate plans under Titles I, X, and XIV, the titles dealing with aid to these individuals. But it is most significant that while Congress considered the three adult categories similar enough to permit the estates to adopt a common plan for them, it did not include Aid to Dependent Children in Title XVI, so that states must still keep the ADC plan and program separate, even if they combine the other three categories into one plan.

The Court has accepted a brief from the Secretary of Health, Education and Welfare on the nature of the Social Security Act and certain sections therein and certain HEW regulations issued pursuant thereto. The Secretary of Health, Education and Welfare states in this brief that except for certain express statutory exceptions in the Social Security Act,

"[E]ach title of the Social Security Act stands on its own. Insofar as the State is free to set its own standard of need and to determine the level of benefits, it may exercise its powers independently for each of its programs. It may have one standard of need for the aged, another for the blind, and a third for ADC. Similarly, it may have different levels of payment for each program, and changes for one program may be made independently of changes, or lack of changes, in another program."

\*     \*     \*     \*     \*     \*

"Louisiana's reduction in ADC payments without a corresponding reduction in its other financial assistance programs does not violate the Social Security Act or the Federal regulations." [5]

■ This Court places great weight on the construction given to the Social Security Act by the Department of Health, Education and Welfare, which federal agency has the responsibility of carrying out and administering its provisions. "The interpretation expressly placed on a statute by those charged with its administration must be given weight by courts faced with the task of construing the statute." Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed. 2d 179 (1965)

■ For the foregoing reasons, we hold that the plaintiffs have not succeeded in showing that ADC is sufficiently closely related to the three adult public assistance categories in question so as to warrant comparing actions taken in the ADC program to actions taken under the three adult categories under the Equal Protection Clause. An opposite holding could lead to the undesirable result of forcing a state to withhold benefits from

---

Blind, Title X (Sections 1001–1006) of the Act, 42 U.S.C. § 1201–§ 1206; Aid to the Permanently and Totally Disabled, Title XIV (Sections 1401–1405) of the Act, 42 U.S.C. § 1351–§ 1355.

5. Brief of Robert H. Finch, Secretary of Health, Education and Welfare as Amicus Curiae, at pages 7–8.

recipients under one public assistance program because it is unable to give the same benefits to recipients in all its public assistance programs.

Even if we assume, arguendo, that the actions in one public assistance category must be judged in terms of other public assistance categories under the Equal Protection Clause, we do not believe that the plaintiffs have proved that Act No. 9, Schedule 9, Item 13, Louisiana Legislative Acts, Regular Session, 1968, or the 10% reduction of ADC grants are violations of the Equal Protection Clause.

Act No. 9, Schedule 9, Item 13 prohibits the reduction of Old Age Assistance regular maximum grants of $89.00 and $83.00 unless such reduction is approved by the Legislature. No other public assistance category enjoys the benefit of such a provision.

The Supreme Court has set out guidelines by which acts are to be judged under the Equal Protection Clause. In Morey v. Doud, 354 U.S. 457, 463–464, 77 S.Ct. 1344, 1349, 1 L.Ed.2d 1485 (1957), the Supreme Court said:

"The rules for testing a discrimination have been summarized as follows:

" '1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369."

■ We do not think the plaintiffs have "carr[ied] the burden of showing that" the prohibition against reductions in OAA grants contained in Act No. 9 "does not rest upon any reasonable basis, but is essentially arbitrary." Morey v. Doud, supra, 354 U.S., at 464, 77 S.Ct., at 1349. The Legislature may well have believed that the aged are most vulnerable of those in need because of their physical and mental disabilities and deterioration brought on by age, their lack of employability, their inability to provide for themselves in case of need, and because of other similar reasons. While we do not necessarily agree or disagree with the Legislature's decision to provide only OAA recipients with this safeguard against reduction of their grants, we cannot say that this provision is so lacking in any reasonable basis as to be purely arbitrary.

Likewise, we cannot say that the 10% reduction in ADC grants by the defendants is utterly without a rational basis. We are convinced that the 10% cut was due solely to lack of state funds to satisfy the increase of recipients in the ADC category. The evidence presented does not show that 10% reduction in ADC grants was ordered for any reason other than the purpose of living within the amount allotted for the ADC category— an amount which had to be divided among a larger number of recipients. The Supreme Court recognized the right of the states to determine the allocation of the funds devoted to a particular program by the amount of funds available for such a program in King v. Smith, 392 U.S. 309, 318–319, 88 S.Ct. 2128, 2134, 20 L.Ed.2d 1118 (1968), when it said:

"There is no question that States have considerable latitude in allocating their AFDC [Aid to Families with Dependent Children] resources, since each State is free to set its own standard of need and to determine the level of

benefits by the amount of funds it devotes to the program."

Since the number of recipients suddenly increased only in the ADC category, the Louisiana Department of Public Welfare officials may well have concluded that it would have violated the rights of the blind and disabled to cut their grants when there was no similar increase in the number of recipients covered by these programs. Certainly, blind and disabled individuals are also extremely vulnerable because of their lack of employability and the difficulties which such persons must encounter in caring for themselves.

For the foregoing reasons, we therefore hold that neither Act No. 9, Schedule 9, Item 13, Louisiana Legislative Acts, Regular Session, 1968, nor the 10% reduction in ADC grants, deprived the plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment.

## PLAINTIFFS' ALLEGATION OF RACIAL DISCRIMINATION

Plaintiffs next contend that Act No. 9 and the 10% reduction in ADC grants discriminate against the plaintiffs because they are mostly Negroes. Such racial discrimination, say the plaintiffs, is contrary to the Fourteenth Amendment's Equal Protection Clause, and they claim that it also violates Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Plaintiffs point to Louisiana's past policies in the ADC program as evidence that Act No. 9 and the 10% reduction in ADC grants are racially discriminatory. Plaintiffs specifically point to the "suitable home" law and the "man in the House" policy. The "suitable home" law, LSA–R.S. 46:233 provided that "no assistance shall be granted to a child living with its mother, if the mother has had an illegitimate child after receiving assistance from the Department of Public Welfare, unless and until proof satisfactory to the parish board of public welfare has been presented showing that the mother has ceased illicit relationships and is maintaining a suitable home for the children." Ninety-five per cent of the children disqualified under the suitable home law were Negroes. In 1962, the "suitable home" law was rescinded, but Louisiana's "man in the house" policy remained in effect until after the Supreme Court struck down a similar Alabama policy in King v. Smith, supra, 392 U.S. 309, 88 S.Ct. 2128 (1968). Under the "man in the house policy", a family was disqualified from receiving ADC grants if the parent and a member of the opposite sex either lived together as man and wife and maintained a common household, or had continuous intimate relations even if they did not maintain a common household. It was the sudden increase in eligible recipients as a result of the abandonment of the "man in the house" policy which resulted in the 10% cut in ADC grants.

Plaintiffs point out that the ADC recipients are overwhelmingly Negro (80%) [6] and contend that the ADC program is being discriminated against as a whole because it is identified as a Negro program.

We first consider plaintiffs' contention that the portion of Act No. 9 prohibiting cuts in Old Age Assistance grants is a racially discriminatory provision because of what plaintiffs refer to as the "whiteness" of the Old Age Assistance category.[7] However, an examination of the relevant statistics reveals that as of March, 1968, only 52% of OAA recipients were white, while Negroes constituted

---

6. Louisiana Welfare Statistics, January, February and March, 1968, at 28, Table 33–d.

7. Plaintiffs' "Memorandum of Law * * * Discrimination in ADC," at page 5.

48% of old age assistance recipients.[8] While it is true that there is a far greater percentage of Negroes receiving assistance under the ADC program, we cannot accept plaintiffs' contention that OAA is a "white" program because 52% of its recipients—no more than a bare majority—are white.

■ We do not think that the plaintiffs have made a sufficient showing of racial discrimination in the prohibition of Act No. 9 so as to warrant our declaring it void either under the Equal Protection Clause or under the Civil Rights Act of 1964.

Plaintiffs also argue that the 10% cut in ADC grants was motivated by racial discrimination. Plaintiffs' reference to Louisiana's "suitable home" law and the "man in the house" policy does present some circumstantial evidence that the 10% reduction could have been the result of racial discrimination. But, again, this evidence is easily outweighed by another glance at the statistics.[9] For the non-OAA categories which the defendants are allegedly favoring can also be identified as "Negro" programs. Only 39% of the Aid to the Needy Blind recipients are white, while 61% are Negro. Only 46% of the recipients of Disability Assistance grants are white, while 54% are non-white. Even in the General Assistance program, which is entirely funded by the State of Louisiana and which has not been as much the object of plaintiffs' attacks as the other non-ADC categories, is only 43% white and 57% Negro. From all of the evidence submitted at this time, we hold that the plaintiffs have failed to carry the burden of proving discrimination in favor of a white group of recipients against a Negro group of recipients. Although it is true that a greater percentage of the ADC recipients are Negro, this does not alter the fact that a majority of the recipients in all the non-OAA categories are Negroes.

We also reiterate our stand taken earlier in this opinion that the plaintiffs have not shown that either Act No. 9 or the 10% cut in ADC grants was completely without a reasonable basis so as to be purely arbitrary. Nor have they shown that ADC is closely enough related to the other public assistance programs in question so as to require equal treatment to the recipients of each of these categories.

## PLAINTIFF'S ARGUMENT UNDER SECTION 402(a) (23) OF THE SOCIAL SECURITY ACT

Plaintiffs next launch a statutory assault on the 10% reduction in the ADC grants, arguing that this cut was in violation of Section 402(a) (23) of the Social Security Act, 42 U.S.C. § 602(a) (23), which statute provides:

"A State plan for aid and services to needy families with children must * * * provide that *by July 1, 1969,* the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted." (Emphasis added.)

Even a cursory glance at this statute reveals without any doubt whatsoever that it does not go into effect until July 1, 1969. Section 402(a) (23) clearly says that the State does not have to adjust the needs of ADC recipients or the maximums payable to them until that time. Plaintiffs argue that the legislative history of the statute shows that the purpose of the long period between the date the law was signed (January 2, 1968) and the date on which it goes into effect was to give the states time to make the necessary studies of cost-of-living changes and to legislate accordingly. But from this interpretation of the legislative history, which may well be correct, plaintiffs draw the dubious

8. See note 6, *supra.*

9. See note 6, *supra.*

conclusion that "the lack of explicit federal compulsion to do less than maintain grants at their 1967 levels until that date * * *. Indeed, § 402(a) (23) provides an affirmative compulsion on Louisiana to actively work towards the July 1, 1969 increases, and not to lower the grants in the process." [10]

██ We cannot agree with this reasoning. It may be true that the purpose of the long delay between the signing of the act and the date of its effectiveness was to give the states time to study the cost-of-living changes and to legislate pursuant thereto. But it simply does not follow that there is an "affirmative compulsion" on the states to actively work toward the July 1, 1969 increases and not to lower the grants before that date. In the absence of any legislative history indicating a contrary conclusion, we simply read the statute as it was written. And it is obvious that "by July 1, 1969" can only mean that the new state plans must go into effect as of that date and not before. We see nothing in the statute itself or in the legislative history to indicate otherwise.

Furthermore, in his brief as amicus curiae, referred to above, the Secretary of Health, Education and Welfare construes Section 402(a) (23) to mean that the states do not have to comply with this section until July 1, 1969:

"* * * [W]e believe that, in its proper application, section 402(a) (23) should be interpreted as it reads, to carry out the intent of its words, and not some more remote and speculative purposes.

"Louisiana has until July 1, 1969, to comply with the adjustment requirements of section 402(a) (23).

"Section 402(a) (23) of the Social Security Act requires that a State ADC plan must provide that 'by July 1, 1969' certain prescribed actions will have been taken. On their face, these words are satisfied if the State has complied by that date. Nothing is said about what the States may do or not do before that date." [11]

As we said before, we have considerable respect for the Secretary's interpretation of the Social Security Act, since he is charged with the responsibility of administering its provisions. "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

We agree with the Secretary of HEW that at this time Louisiana has not violated Section 402(a) (23) of the Social Security Act.

## PLAINTIFFS' CONTENTION THAT A DECLARATORY JUDGMENT SHOULD BE ISSUED ON THE MEANING OF SECTION 402(a) (23) OF THE SOCIAL SECURITY ACT

In a supplemental complaint, plaintiffs asked that this Court render a declaratory judgment declaring that Section 402(a) (23), discussed above, requires and compels a state participating in the ADC program to increase payments to recipients by the cost-of-living increase referred to in the statute.

Plaintiffs argue that a declaratory judgment on the meaning of this statute, which, as we have already held, does not go into effect until July 1, 1969, is necessary because the Louisiana Department of Public Welfare is short of the funds needed to increase the ADC payments by that time, and there is a real danger that it will not increase payments on July 1.

In this connection, plaintiffs also want this Court to hold that HEW regulation § 233.20(a) (2) (ii), 34 Fed.Reg. 1394, dated January 15, 1969, is incon-

---

10. Plaintiffs' "Supplementary Pre-Trial Memorandum of Law on * * * Section 402(a) (23) of the Social Security Act," at page 9.

11. Brief of Robert H. Finch, Secretary of Health, Education and Welfare as Amicus Curiae, at pages 11–12.

**346**

sistent with Section 402(a) (23) of the Social Security Act and consequently is invalid. § 233.20(a) (2) (ii) provides:

"A State Plan for * * * AFDC * * * must, as specified below:

"In the AFDC plan, provided that by July 1, 1969, the State's standard of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted * * *. *In the event the State is not able to meet need in full under the adjusted standard, the State may make ratable reductions* in accordance with subparagraph (3) (viii) of this paragraph * * *." (Emphasis added.)

The plaintiffs object to the Regulation's statement that payments may be ratably reduced despite the new cost-of-living increases even after July 1, 1969.

The plaintiffs' argument may well be correct, but we believe that the time has not yet come for us to rule on this point. Louisiana's current welfare appropriation, as set out in Act 9, Louisiana Legislative Acts, Regular Session, 1968, is in effect only until June 30, 1969, the day before the deadline set in Section 402(a) (23). As of now the Louisiana Legislature has not enacted a new appropriations law for the fiscal year commencing July 1, 1969, the date Section 402(a) (23) goes into effect. We cannot say at this time whether or not Louisiana will devote additional funds to

ADC for the new cost-of-living increases in the new appropriations bill. We certainly cannot tell what Louisiana will do after July 1 from an appropriation bill which expires on June 30.

■ For these reasons, we conclude that this point is not yet ripe for adjudication by means of a declaratory judgment. However, we will retain jurisdiction over this case for the purpose of passing on this point if it is necessary at all after Louisiana enacts its new welfare appropriations law.

Clerk will prepare a judgment in accordance with this opinion.

CASSIBRY, District Judge (dissenting):

Suppose a school desegregation case. Six grades have been voluntarily integrated when the court orders that the entire system be unitized by July 1, 1969. The school board then resegregates the six grades already integrated, and contends this reversal is permitted because the court order has no effect until July 1, 1969. Would the court allow such a turnabout? Obviously not. Yet the majority permit just such an action in this welfare case. Louisiana, though under a Congressional mandate to increase payments to ADC families by July 1, 1969, is permitted to reduce ADC payments below the level in existence when Congress enacted the mandate. Finding no significant difference between the action of the school board and that of Louisiana, I dissent.[1]

This case involes the meaning and effect of section 402(a) (23) of the Social

1. Both the Constitution and the statute require a certain result—full desegregation of schools and more money for ADC families. But just as the Supreme Court has recognized the need to delay application of the Constitutional·mandate to enable the school boards to overcome the practical problems of desegregating a dual school system, Brown v. Board of Education II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), so Congress, as will be shown *infra* at 338, has recog-

nized the need to delay application of the statutory mandate to enable the states to legislate the measures required to implement the increases. In both cases, then, additional time was 'needed as a practical necessity before the intended results could be implemented. And in both cases it is the same inference that prohibits action retarding attainment of the ultimate goal. Neither the Constitution nor the statute intends that there should be a regression in the level of de-

Security Act,[2] which requires a state ADC plan to:

> provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

To me, this statute requires the states to increase ADC payments no later than July 1, 1969, in accordance with the change in the cost of living since the existing level of payments was established, *and* prohibits any reduction in payments before that date. To my brethren, however, "it is obvious that 'by July 1, 1969' can only mean that the new state plans [providing the necessary increases] must go into effect as of that date *and not before*" (emphasis added), and that section 402(a) (23) can therefore have no effect on the states' freedom to determine the levels of ADC grants until that date. Without taking issue with the majority's logic, which is clearly not beyond reproach, we might better reveal the mistaken premise upon which it is based. For the majority's bald assertion that section 402(a) (23) obviously has no operative effect before July 1, 1969, was not so obvious to the House-Senate Conference Committee, which reported out the provision noting that it could be satisfied by an appropriate adjustment *"before July 1, 1969"*, Conf. Rep. No. 1030, 90th Cong., 1st Sess. (1967), U.S. Code Cong. & Ad. News, pp. 3137, 3209 (1967) (emphasis added), nor to the Department of Health, Education, and Welfare, which maintains in its amicus brief that a state could choose to comply with section 402(a) (23) earlier than July 1, 1969, and thus limit the time-span

for rising living costs, nor to Texas, which has made the necessary adjustments effective May 1, 1969. Texas State Department of Public Welfare, Office Memorandum D–430 (Feb. 28, 1969). Furthermore, the majority's reading of the effective date of the statute is not in accord with the very language used, for had Congress wished to make the provision applicable only after July 1, 1969, it would most certainly have used the term "effective" rather than "by", as it in fact did in other provisions of the 1967 Amendments.[3] Clearly, then, although section 402(a) (23) is not compulsory until July 1, 1969, it is operative as of the date of passage, January 2, 1968, in the sense that it may be satisfied by an appropriate adjustment at any time between these dates.

Doubtless Congress adopted this unusual procedure in order to meet the urgent need of ADC families for increased financial assistance as soon as practicable. Although the ADC program is to a large extent federally funded, it is the states that provide the balance of funds and set the level of payments, and any federal proposal for increased grants requires corresponding state legislative action adjusting legislatively imposed maximums and appropriating whatever additional funds might be necessary. Because some legislatures meet only every other year and would not hold sessions during 1968, the earliest possible date by which all states could comply with a mandated increase was July 1, 1969. Congress thus established this date as the outside deadline for compliance with section 402(a) (23). *Cf.* 113 Cong.Rec. S. 16817 (daily ed. Nov. 20, 1967); 113 Cong.Rec. S. 17017 (daily ed. Nov. 22, 1967). Recognizing, however, that the need for increased payments was immediate and not 1½ years prospective, Congress framed section 402(a) (23) to

---

segregated schools or ADC payments during the interim period set aside for compliance with the mandates requiring increases in these levels. The result should be the same in both.

2. 42 U.S.C.A. § 402(a) (23) (Supp.1969). This section was added to the Act by

section 213(b) of the Social Security Amendments of 1967, 81 Stat. 898.

3. *E. g.*, section 205(a) of the Social Security Amendments of 1967, 81 Stat. 892. This amendment added section 402(a) (20) to the Social Security Act, 42 U.S. C.A. § 602(a) (20) (Supp.1969).

permit states to enact appropriate increases before July 1, 1969, and still comply with the requirements of the statute.

If the states were indeed free to reduce ADC payments before July 1, 1969, Congress condoned actions not only inconsistent with its ultimate policy objective to *raise* ADC payments as soon as possible, but also contrary to its purpose for providing a 1½ year delay to allow the states time to act in *furtherance* of the statutory command. Applying "reason and common understanding to reach the results intended by the legislature", Rathbun v. United States, 355 U.S. 107, 109, 78 S.Ct. 161, 163, 2 L.Ed.2d 134 (1957), such a condonation cannot be attributed to Congress.

But this is not the only way Congressional intent would be subverted if pre-July 1, 1969, reductions were permitted. For instance, a state intent upon inhibiting the cost effects of the statute could merely reduce ADC grants for the year and one-half prior to July 1, 1969, and effectively neutralize, for a limited time anyway, the cost it might incur from the post-July 1, 1969, increase in ADC payments. Accordingly, a ten percent reduction for the entire period before July 1, 1969, would nullify a ten percent cost of living increase through December 31, 1970. The possibility of larger reductions, while devastating to the sustenance of the recipients, is not at all unthinkable. Certainly Congress did not intend such reductions; they would sap the whole purport of the statute that after July 1, 1969, ADC recipients should be in a better overall financial position than they would have otherwise been in; they would encourage a state to subsidize the increases by only aggravating the very problem Congress sought to ameliorate; they would undermine Congress' selection of the level of ADC payments on January 2, 1968, the date of enactment, as the benchmark for computing the size of the increases; and they would conflict with Congress' determination that the existing level of ADC payments is inadequate and must be increased (not

decreased) as soon as practicable. Moreover, even though the statute intends pre-July 1, 1969, increases, no state would be encouraged to implement such increases (thus keeping the cost of living increment at a minimum), because there is now a much simpler, more direct, and more effective method to limit the cost effects of the statute—simply reduce grants before July 1, 1969.

In sum, when Congress compelled the states to increase ADC payments for food, clothing, and shelter by July 1, 1969, it did not intend to allow them to avoid the impact of these increases by financing them in whole or in part by reductions in the existing allotments for these necessities of life in the meantime. Rather, Congress necessarily intended to maintain at least the status quo by setting a floor below which ADC payments could not be reduced, which is certainly the level of ADC payments on January 2, 1968, the base figure from which the increases required by section 402(a) (23) are to be determined. Though this prohibition on reductions is not expressly stated in the statute, it is necessarily implied, for any other conclusion is "plainly at variance with the policy of the legislation as a whole." United States v. American Trucking Assns., Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940). And "that which is implied in a statute is as much a part of it as that which is expressed." United States v. Jones, 204 F.2d 745, 754 (7th Cir. 1953). The prohibition, therefore, should be suitably enforced.

In order to prohibit reductions in ADC payments in the interim period, section 402(a) (23) must require increases by July 1, 1969. Indeed, this is what its language purports to say. Yet defendants, along with the Department of Health, Education, and Welfare (HEW), which was invited to file a brief amicus curiae because of the relevance of its regulation interpreting section 402(a) (23), reject the plain meaning of the statute, and contend that it does not in fact require the increases its language

clearly commands. The majority do not reach this question; they find it premature in the light of their conclusion that section 402(a) (23) is not operative until July 1, 1969. While it obviously has to be considered in this dissent, the discussion must await an examination of the methods followed by Louisiana and the other states to determine the appropriate amount of ADC payments. For until one has an appreciation of these methods, the intended meaning and effect of section 402(a) (23) are not entirely apparent.

Setting forth these procedures might initially appear to be a difficult task for ADC grants vary widely in amount among the states and give the impression that no uniform system for allotting ADC payments is followed. But the differences among the states in the size of ADC grants result more from the states' complete discretion to determine the needs standards of their deprived citizens and the extent to which they are met by assistance payments than from the use of different methods for computing the level of grants. Thus the basic allotment procedure is easily delineated.

Each state estimates its standard of need or assistance, which is the minimum monthly amounts required by its needy citizens for food, clothing, shelter, and other necessities. From this low-income budget, which varies according to the size of the family and is different in different states, each state deducts the income of the recipient, subject to allowable exemptions, leaving what is known as a budgetary deficit. In theory the budgetary deficit is the amount of the assistance payment, but in practice many states pay less by imposing arbitrary dollar maximums on the amount of aid paid, by paying only a fixed percentage of the budgetary deficit, or by a combination of both whereby a fixed percentage is paid but only up to a set dollar maximum. Of the fifty-four jurisdictions participating in the ADC program,[4] twenty-four impose neither a percentage nor a dollar maximum, and pay the full budgetary deficit or 100 percent of need.[5] Seven jurisdictions pay a percentage of the budgetary deficit, while four follow a variant and pay a percentage of the standard of need.[6] Finally, twenty-six jurisdictions, including some which impose percentage reductions, place a legal or administrative dollar maximum on the amount that can be paid. Amounts are stipulated for each additional child, sometimes up to a family maximum expressed in a dollar amount, or cumulative amounts based on a given number of children are used, limited in terms of the number of children or a maximum payment. Louisiana follows this last system.

Louisiana pays the budgetary deficit up to the following maximums for each size family:

| | | | |
|---|---|---|---|
| 1 child | — | $ 80.00 per month | |
| 2 children | — | 99.00 " " | |
| 3 children | — | 116.00 " " | |
| 4 children | — | 133.00 " " | |
| 5 children | — | 145.00 " " | |
| 6 children | — | 163.00 " " | (family maximum) |

4. The following information about the administration of ADC programs in the various jurisdictions was provided in appendices to a brief amicus curiae submitted by the Department of Health, Education, and Welfare. It is as yet unpublished and was prepared by the National Center for Social Statistics, Social and Rehabilitation Service (HEW).

5. Payment of full need, however, does not *necessarily* indicate greater concern for needy citizens by these states, for states which pay full need may well have unrealistic need standards.

6. Under this variant, income is deducted after the percentage is applied to the standard of need, and the state pays the deficit.

Louisiana's plant to reduce ADC costs would cut each grant by ten percent, including those grants already limited by the arbitrary maximums set forth above. In the case of the individual plaintiffs Lampton and Williams, who support families of six or more, the proposed reduction means their maximum monthly payment will be cut from $163.00 to $146.70, while their recognized minimum standards of need remain unchanged at $212.00 and $263.00, respectively.

"In the interpretation of statutes, the function of the courts * * * is to construe the language so as to give effect to the intent of Congress." United States v. American Trucking Assns., Inc., *supra*. Although "our first reference is of course to the literal meaning of the words employed," Flora v. United States, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958), our inquiry but begins there, for "all statutes must be construed in the light of their purpose." Haggar Co. v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940). In this case, however, the words of the statute leave little ambiguity regarding Congressional purpose, and thus have considerable force in and of themselves.

Section 402(a) (23) requires that "by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established." By enacting this provision, Congress meant to require the states to increase need standards. For in no state has the cost of living declined or even remained the same since the date of enactment; rather it has increased sharply. Nor is there any likelihood that Congress, in this time of rising price levels going back to the end of World War II, expected anything but such an increase. Furthermore, by the quoted language Congress meant to require the states to give full effect to changes in living costs since need standards were last established *before* January 2, 1968, when the provision was enacted into law. Thus a state could not reduce

its need standards subsequent to January 2, 1968, and then adjust only for changes in living costs which occurred in the period after such reduction. This would be an obvious evasion of section 402(a) (23).

To determine the purpose served by this mandate to increase the standard of need, we need only refer to the universal use of the standard of need as the base for computing the level of ADC recipient grants, and the remaining language of section 402(a) (23), which provides that along with the necessary cost of living changes in need standards, "any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted." ADC payments in all states are predicated upon the need standard; if this standard is increased, as section 402(a) (23) requires, the budgetary deficit must also increase accordingly. In those states paying the budgetary deficit in full, as well as in those states that pay only a percentage of the budgetary deficit (or the standard of need), section 402(a) (23) necessarily requires increased ADC grants corresponding to the increase in the standard of need, for a percentage maximum (100 percent or less) kept constant automatically translates increased need into an increased payment. Similarly, in those states imposing an arbitrary dollar maximum on the size of the assistance grant, section 402(a) (23), by requiring that the maximums imposed be adjusted in accordance with the change in the cost of living, insures increased grants for all recipients. Regardless of which system of computing ADC payments the state follows, section 402(a) (23) is therefore designed to effectuate increased ADC recipient grants. The language of the statute could not be any clearer.

Equally clear is the legislative history of section 402(a) (23), which, although in no wise substantial, nonetheless unequivocally delineates Congress' intention to compel the states to raise ADC payments.

Section 402(a) (23) had its genesis before the Senate Committee on Finance as a proposed amendment by HEW to H.R. 12080, 90th Cong., 1st Sess. (1967), the Social Security Amendments as passed by the House of Representatives. The amendment called for the states to meet need in full as they determined it, and required that the states update their need standards to reflect current prices, and review these standards annually and modify them in accordance with significant changes occurring in the cost of living.[7] Hearings on H.R. 12080 Before the Senate Committee on Finance, 90th Cong., 1st Sess., pt. 1, at 635 (1967) [hereinafter Hearings]. Like provisions were suggested for the adult categorical assistance programs.[8] Hearings, pt. 1, at 634–37. These amendments were designed to meet the problem of inadequate and unrealistic assistance payments by compelling increases in the level of payments in all categories.[9]

Although the Committee extensively modified the far-reaching HEW proposals, the provisions reported out and adopted by the Senate, which were discussed in the Section-by-Section Analysis contained in the Senate Report under the heading "Increasing Income of Recipients of Public Assistance," were doubtless intended to ameliorate, though to a lesser degree, the same problem—the low level of assistance grants—in the same manner—requiring the states to increase payments. S.Rep. No. 744, 90th Cong., 1st Sess. (1967), U.S. Code Cong. & Ad. News, pp. 2834, 3132 (1967).

The Committee bill rejected the HEW recommendation that the states meet needs in full as they determine them. But it did incorporate the annual cost of living adjustment for the ADC program,[10] and substitute in the adult programs a one-time mandatory average increase of $7.50 per month in the amount of assistance,[11] S.Rep. No. 744, 90th

---

7. The text of the proposed amendment follows:

"[each state plan must provide] (A), effective July 1, 1969, for meeting (in conjunction with other income that is not disregarded, or set aside for future needs, under the plan and other resources) all the need, as determined in accordance with standards applicable under the plan for determining need, of individuals eligible to receive aid to families with dependent children (and such standards shall be no lower than the standards for determining need in effect on January 1, 1967) and (B), effective July 1, 1968, for an annal review of such standards and (to the extent prescribed by the Secretary) for updating such standards to take into account changes in living costs;". Hearings on H.R. 12080 Before the Senate Comm. on Finance, 90th Cong., 1st Sess. pt. 1, at 635 (1967).

8. These programs are: Old Age Assistance and Medical Assistance for the Aged, 42 U.S.C. §§ 301–306; Aid to the Blind, 42 U.S.C. §§ 1201–1206; Aid to the Permanently and Totally Disabled, 42 U.S.C. §§ 1351–1355; Aid to the Aged, Blind or Disabled or for such Aid and Medical Assistance for the Aged, 42 U.S.C. §§ 1381–1385.

9. Testifying in support of the proposed additions to the House bill, Secretary of

HEW John W. Gardner and Under Secretary Wilbur J. Cohen documented the inadequacy of assistance payments, especially in the ADC program, and attributed this principally to the states' desire to limit their financial responsibility. Hearings, pt. 1, at 216 (testimony of John W. Gardner); Hearings, pt. 1, at 255–259 (testimony of Wilbur J. Cohen).

10. The Committee provision required a state plan for ADC to provide that:

"by July 1, 1969, *and at least annually thereafter*, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and that any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted." (emphasis added).

Except for the emphasized language which was deleted by the Conference Committee, this provision parallels that enacted by Congress.

11. The Committee provision required that non-ADC plans must:

"provide that the standards used for determining the need of applicants and recipients for and the extent of such assistance under the plan, and any maximum on the amount of assistance,

Cong., 1st Sess. (1967), U.S. Code Cong. & Ad. News, pp. 2834, 3132 (1967), a change designed to assure that all non-ADC recipients would benefit from the increases.[12] The Senate passed these provisions without amendment,[13] and sent the bill to a Senate-House Conference Committee to iron out the differences. In the Conference Committee the mandatory $7.50 increase for the adult categories was replaced by a $7.50 disregard of income provision discretionary with the states. (This allows a state, if it chooses, to disregard $7.50 of income when computing the budgetary deficit. The previous figure was $5.00 per month.) Conf.Rep.No. 1030, 90th Cong., 1st Sess. (1967), U.S. Code Cong. & Ad.News, pp. 3179, 3208–09 (1967). No similar change was made in the ADC provision; it remained mandatory upon the states. But the Conference Committee did not leave the Senate provision requiring increases unscathed, for the annual cost of living adjustment was deleted, thus leaving only a one-time cost

of living adjustment before July 1, 1969. *Id.*

Notwithstanding these Conference Committee modifications, it is manifest that the intendment of the Finance Committee and the Senate survived at least with respect to the ADC provision, and that Congress undoubtedly meant what it said in section 402(a) (23) when it required the states to raise ADC payments. Clearly the course of the provision from its inception before the Senate Committee on Finance until its final passage by Congress allows no other conclusion. That this abrupt shift in Congressional policy, which for approximately thirty-five years had allowed the states complete freedom to determine the level of assistance grants, was unaccompanied by extensive committee reports, floor debates, and cost estimates is immaterial when, as here, the Congressional purpose to make such a shift is otherwise clearly discernible. "A restrictive interpretation should not be given a statute merely because Congress has chosen to depart

will have been so modified that an increase in the amount of assistance and other income will not be less than $7.50 per month per individual * * * above such amount of assistance and other income available under the standards and maximum applicable under the plan on December 31, 1966."

12. Since many of the recipients of aid in the adult categories also receive social security benefits, had the cost of living mechanism been used, the intended increase in assistance payments would have been offset for those individuals who are dual beneficiaries by the increase in social security benefits provided by H.R. 12080. (Social security benefits are considered income and serve to reduce the budgetary deficit, which means a reduced assistance grant.) By assuring each recipient an increase of $7.50 per month in his total amount of assistance and other income, this provision avoids any such offsetting effects. Naturally, this device need not have been employed to assure increased grants in the ADC program, because most ADC recipients do not receive social security benefits. Thus, in this program the cost of living adjustment proposed by HEW could be retained. S.Rep. No. 744, 90th Cong.,

1st Sess. (1967), U.S.Code Cong. & Ad. News pp. 2834, 3006–07 (1967). See also 113 Cong.Rec.S. 16642 (daily ed. Nov. 16, 1967) (remarks of Senator Ribicoff) ; 113 Cong.Rec.S. 17036 (daily ed. Nov. 22, 1967) (remarks of Senator Randolph).

13. Senator McGovern proposed the only amendment to section 402(a) (23). It would have substituted a $4.00 per month per individual increase in ADC payments for the cost of living adjustment in need standards. The announced purpose of the amendment was to raise ADC payments, which are considerably lower than those in the adult programs, by the same percentage (eleven percent) as the $7.50 increase in the adult programs. 113 Cong.Rec. S 16963 (daily ed. Nov. 21, 1967) (remarks of Senator Mansfield, who introduced the amendment on behalf of Senator McGovern). In other words, the amendment was designed to insure that in all states—even those where only marginal increases in the cost of living had occurred—ADC recipients obtained the same guaranteed eleven percent increase in their assistance payments as was provided for the adult recipients. The amendment was rejected. Id. at S 16964.

from custom * * *." United States v. Sullivan, 332 U.S. 689, 693, 68 S.Ct. 331, 334, 92 L.Ed. 297 (1948). However significant the departure may be, the duty of the court "to search out and follow the true intent of the legislature, and to adopt that sense of the words, which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature" remains the same. United States v. Winn, 28 Fed.Cas. 733, 734 (No. 16,740) (C.C.D.Mass.1838) (Story, J.), quoted approvingly in Johnson v. Southern Pacific Company, 196 U.S. 1, 18, 25 S.Ct. 158, 162, 49 L.Ed. 363 (1904).

In its amicus brief, HEW rejects the foregoing analysis of the language and history of section 402(a) (23). According to HEW, the provision does not require increased ADC payments because Congress has intentionally "left open" a method whereby the states can avoid the ostensible effect of the statute to raise payments. This method is set forth in section 233.20(a) (2) (ii) of its Regulations, 45 C.F.R. § 233.20(a) (2) (ii), 34 Fed.Reg. 1394 (Jan. 29, 1969). The Regulation states in pertinent part that a state plan for ADC must:

> provide that by July 1, 1969, the State's standard of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted. * * * In

the event the State is not able to meet need in full under the adjusted standard, the State may make ratable reductions in accordance with subparagraph (3) (viii) of this paragraph.* Nevertheless, if a State maintains a system of dollar maximums, these maximums must be proportionately adjusted in relation to the updated standards.

HEW promulgated this regulation on January 28, 1969, to guide the states in their compliance with section 402(a) (23) and to "make it clear that while States must update their standards, if the States do not have the money to pay according to such standards they may make a ratable reduction * * *." 34 Fed.Reg. 1394 (January 29, 1969).[14] By a ratable reduction HEW means that a state may reduce the need standard by whatever percentage it chooses, and then compute the level of ADC grants from this reduced basis, which necessarily leads to a lower grant than that resulting from the application of the provisions of section 402(a) (23). For example, states formerly paying 100 percent of need (usually up to an arbitrary maximum) could add the cost of living increase required by section 402(a) (23) to the standard of need (and adjust their maximums accordingly), and then change and pay a lesser percentage of the increased need, while states paying less than 100 percent of need could make the necessary cost of living adjustment and then pay a still lesser percentage. Thus, while the standard of need and dollar maximums[15] remain at the increased levels

---

* This subparagraph is merely a reminder that such a reduction must be applied statewide. A state plan must:
  "Provide that payment will be based on the determination of the amount of assistance needed and that, if full individual payments are precluded by maximums or insufficient funds, adjustments will be made by methods applied uniformly statewide."
  45 C.F.R. § 233.20(a) (3) (viii), 34 Fed. Reg. 1395 (Jan. 29, 1969).

14. The regulation dealing with section 402 (a) (23) was first promulgated in the HEW Interim Policy Statement No. 4,

33 Fed.Reg. 10230 (July 17, 1968). In its initial form the regulation simply restated the statutory provision, thus giving no indication that the effect of the statutory command could be avoided by a ratable reduction.

15. To emphasize that maximums must indeed be proportionately adjusted in relation to the repriced standard of assistance, and that they could not be adjusted and then reduced because of inadquate funds pursuant to section 233.-20(a) (3) (viii) of the Regulations, *supra* at 353, the last sentence was added to the regulation interpreting section 402(a)

354

mandated by Congress, a state, by following the percentage reduction procedure, could avoid in part or obliterate completely the otherwise necessary and inexorable effect of section 402(a) (23) to raise the level of recipient grants.[16]

In support of its position, HEW principally contends that Congress having devoted so little attention to section 402(a) (23), it should be interpreted literally to mean no more than its words themselves provide. Accordingly, since the provision commands adjustments only in the standard of need and dollar maximums, and does not refer to the percentage reductions permitted in the regulation, it should not be read to preclude them.[17] In other words, HEW seeks to infer a Congressional sanction of percentage reductions from the failure to mention them in section 402(a) (23). However, because a percentage maximum kept constant automatically transfers the increase in the standard of need into an increased payment, it is not at all surprising that Congress did not refer to percentage reductions in section 402(a) (23); there simply was no need to in order to achieve the desired increases.

Therefore, to translate this omission into an implied Congressional sanction of percentage reductions is unwarranted.

Furthermore, a percentage reduction reduces the necessary effect of the standard of need as effectively as a dollar reduction, which HEW admits "would fly in the face of the statutory requirement [to update the standard of need], and cannot be accepted." By both methods the result is a decreased standard of need which leads to a decreased assistance payment. Ever mindful that "That which we call a rose, by any other name would smell as sweet",[18] I must therefore conclude that if a dollar reduction in the standard of need is precluded by implication by section 402(a) (23), a percentage reduction likewise is prohibited.

Finally, the HEW interpretation of section 402(a) (23) cannot be accepted for it nullifies the effectiveness of the provision, and a court will "not suppose that Congress intended to enact unnecessary statutory amendments", Uptagrafft v. United States, 315 F.2d 200, 204 (4th Cir. 1963), or presume "that the legislature intended any part of a statute to be without meaning." General Motors Ac-

(23). Thus, if funds were inadequate, ratable reductions could be made in relation to the standard of assistance only, not in relation to the maximums. Needless to say, the effect on the level of recipient grants is the same; they are reduced. But, according to HEW, the language of section 402(a) (23) permits one and prohibits the other.

16. The Texas experience is instructive. From paying 100 percent of need for a family of four, up to a dollar maximum of $102.00, the state, in accordance with the HEW regulation, reevaluated the need standards and substituted a percentage maximum of fifty percent. See Texas Department of Public Welfare, Office Memorandum E–430 (Feb. 28, 1969) (effective May 1, 1969). A family of four with a typical calculated need of $180.00 will now receive a monthly payment of $90.00. Prior to imposition of the fifty percent maximum, the same family would have received $102.00. The Texas policy is currently being challenged as violative of section 402(a) (23) in Jefferson v. Hackney, Civil Action No. 3–3012–B (N.D.Tex., Dallas

Division). No decision has yet been rendered. Similar suits are also pending in Florida and New York.

17. Underlying this argument is the premise that the statutory directive that "any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted" refers only to dollar maximums and not to percentage reductions, though the latter is certainly a maximum "on the amount of aid paid" in the same sense as a dollar maximum, for both have the same practical effect of limiting the size of the grant by an arbitrary amount. I find the premise valid. Although "maximum" could mean both dollar and percentage maximums, the term is qualified by the requirement that such maximums be proportionately adjusted in accordance with the adjustment in the standard of need, a requirement certainly inapplicable to a percentage maximum since it need only remain the same to lead to an increased grant, which therefore suggests that the term refers to dollar maximums only.

18. Shakespeare, Romeo and Juilet, Act II, Scene 2.

ceptance Corporation v. Whisnant, 387 F.2d 774, 778 (5th Cir. 1968). Attempting to avoid this conclusion, HEW submits four "significant" effects that the statute would have even under its narrow construction. These involve (1) expansion of the number of individuals eligible for ADC payments because of the increased standard of need, (2) more realistic need standards, (3) increase of dollar maximums, and (4) encouragement of the states to use the more equitable and less arbitrary percentage reductions rather than dollar maximums to reduce the cost of the ADC program. Hardly significant and obviously incidental, these effects cannot be used to camouflage the positive purpose of the statute to raise the level of ADC payments for all recipients. If Congress had solely wished to expand the number of individuals eligible for ADC payments, would it have enacted in the very same bill a provision likely to do just the opposite—the limitation on federal matching funds?[19] If Congress had meant more realistic need standards, would it have legislated a percentage increase from what in many cases was an unrealistic standard to begin with?[20] If Congress had intended to increase

maximums, would it have required changes in need standards as well? And finally, if Congress had meant to effect a shift from the use of maximums to percentage reductions, would it have so beclouded its intent in a maze of increases and reductions?

It is clear, therefore, that the HEW regulation permitting a ratable reduction in the standard of need is violative of the controlling federal statute, and consequently is invalid. King v. Smith, 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). While I am fully cognizant that the views of an administrative agency should be given due deference when issues of statutory interpretation arise, Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), "[t]he administrative ruling in this case was no sooner made than challenged. We cannot be certain how far it was determined by the considerations advanced * * * in its defense in this case. It has hardly seasoned or broadened into a settled administrative practice. * * * [And I] do not think it should overweigh the considerations * * * set forth as to the proper construction of the statute." Davies Ware-

---

19. Section 208(b) of the 1967 Amendments added section 603(d) (1) of the Social Security Act, 42 U.S.C.A. § 603 (d) (1) (Supp.1969), which sets a limitation on Federal financial participation in the ADC program related to the proportion of the child population under age eighteen aided because of the absence from the home of a parent. Federal financial participation would not be available for any excess above the percentage of children of absent parents who received aid to the child population under age 18 in the state as of January 1, 1968. Though initially effective after July 30, 1968, the amendment was amended on June 28, 1968, Pub.L. 90–364, 82 Stat. 273 (1968), to be effective after July 1, 1969.

This limitation on federal funds was designed to induce the states to tighten their eligibility standards, and is therefore likely to restrict the expansion of the ADC program to encompass the marginal families whose income is only slightly above the need amounts. H.Rep.

No. 544, 90th Cong., 1st Sess., at 110 (1967). Thus the implied notion that section 402(a) (23) was designed to expand the number of families receiving ADC is clearly at odds with the expressed policy underlying the freeze on ADC funds, and cannot be accepted as the objective of section 402(a) (23).

In passing, it should be noted that the ADC freeze is entirely consistent with an interpretation of section 402(a) (23) requiring the states to increase the level of ADC grants. While one restricts the expansion of assistance to marginal recipients, the other requires only that the states increase payments to those already eligible to receive assistance under existing standards.

20. In his testimony before the Senate Committee on Finance, Under Secretary Wilbur J. Cohen noted that the lowest need standard set by any state for a family of four receiving ADC is $131.00, while most state standards for such a family range between $150.00 and $250.00. Hearings, pt. 1, at 259.

house Co. v. Bowles, 321 U.S. 144, 156, 64 S.Ct. 474, 481, 88 L.Ed. 635 (1944).

In conclusion, I have found that section 402(a) (23) not only requires the states to raise ADC grants by July 1, 1969, but also necessarily prohibits the states from reducing their grants before that date. Clearly, then, Louisiana's proposed reduction in ADC payments is inconsistent with the terms and conditions imposed by the federal government upon those states voluntarily participating in this federally-funded program.[21] I would enjoin the reduction. King v. Smith, *supra*.

As I would decide for plaintiffs on the basis of section 402(a) (23), I do not reach plaintiffs' constitutional arguments.

---

21. "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." King v. Smith, 392 U.S. 309, 333, n. 34, 88 S.Ct. 2128, 2141, n. 34, 20 L.Ed.2d 1118 (1968).