414 F.2d 170
 Julia ROSADO, Lydia Hernandez, Majorie Miley, Sophia Abrom, Ruby Gathers, Louise Lowman, Eula Mae King, Cathryn Folk, Annie Lou Phillips, and Majorie Duffy, individually, on behalf of their minor children, and on behalf of all other persons similarly situated, Plaintiffs-Appellees,
v.
George K. WYMAN, individually and in his capacity as Commissioner of Social Services for the State of New York, and the Department of Social Services for the State of New York, Defendants-Appellants.
 No. 711.
 No. 726.
 No. 729.
 Docket 33626.
 Docket 33741.
 Docket 33747.
 United States Court of Appeals Second Circuit.
 Argued June 4, 1969.
 Decided July 16, 1969.
 Certiorari Granted October 13, 1969.
 
 See 90 S.Ct. 106.
 COPYRIGHT MATERIAL OMITTED Philip Weinberg, Principal Atty. New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., Amy Juviler, Asst. Atty. Gen., of counsel), for appellants.
 Lee A. Albert, New York City (Henry A. Freedman, Sylvia Ann Law, Nancy Duff Levy, Lucy Katz, New York City, Center on Social Welfare Policy and Law; Martin Garbus, New York City, Roger Baldwin Foundation of the American Civil Liberties Union; Carl Rachlin, James Spitzer, David Draschler, New York City, Scholarship, Education and Defense Fund, Inc.; Burt Neuborne, New York City, New York Civil Liberties Union, of counsel), for appellees.
 Philip Sokol, New York City, for Federation of Jewish Philanthropies; Dorothy Coyle, New York City, for Catholic Charities for the Archdiocese of New York; Mildred A. Shanley, Brooklyn, for Catholic Charities, Diocese of Brooklyn; Louis Agin, New York City, for Federation of Protestant Welfare Agencies, amici curiae.
 Before LUMBARD, Chief Judge, and HAYS and FEINBERG, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 Defendants-appellants, the New York Commissioner of Social Services and the New York Department of Social Services appeal from an order and a judgment of the United States District Court for the Eastern District of New York granting a preliminary injunction, 304 F.Supp. 1354 (1969), and a permanent injunction, ___ F.Supp. ___ (1969), against enforcement of Section 131-a of the New York Social Services Law, McKinney's Consol. Laws, c. 55.[1]
 
 
 2
 An appeal by plaintiffs-appellees from a related decision of a three-judge court has been consolidated with the appeals referred to in the preceding paragraph.
 
 I.
 
 3
 Plaintiffs-appellees in this class action are welfare recipients residing in New York City and in Nassau County. They receive payments pursuant to the Aid to Families with Dependent Children program (AFDC) of the Social Security Act, 42 U.S.C. §§ 601-610 (1964, Supp. IV 1965-68). Under this program, in which all states participate, the federal government provides funds to the states on the condition that the plans for use of the funds meet various federal requirements. 42 U.S.C. § 602(a) and (b) (1964, Supp. IV 1965-68). The states and their subdivisions also provide funds and each state administers its own program.
 
 
 4
 Appellees raised two principal claims in their complaint. The first was that Section 131-a violated Section 602(a) (23) of the Social Security Act[2] as amended in 1967 by reducing the amount of the AFDC benefits paid to them. The second claim, made by those appellees who are residents of Nassau County, was that Section 131-a violated the equal protection clause of the Fourteenth Amendment by providing for lower payments to AFDC recipients in Nassau County than to those in New York City, although the cost of living is substantially the same in both areas.
 
 
 5
 A three-judge district court was constituted under 28 U.S.C. § 2281 (1964) to hear the constitutional claim.
 
 
 6
 While the action was pending before the three-judge court, Section 131-a was amended to permit the Commissioner of Social Services to increase scheduled payments for areas outside New York City up to a maximum no higher than the levels for New York City, upon his determination that the total cost of the items included in the schedule for such an area exceeds the amount provided in the schedule.[3] The three-judge court ruled that this amendment mooted the equal protection claim of the Nassau County recipients, by making it possible for their payments to be increased to the level provided for New York City recipients if the cost of living in Nassau County made such an increase appropriate. It concluded that "any attack on the newly adopted subdivision would not be ripe for adjudication by this Court until there has been an opportunity for action by state officials and until the matter comes before this Court in an appropriate proceeding." The three-judge court also held that the mooting of the constitutional claim made "academic" the question of whether it might have decided the statutory claim in the exercise of its pendent jurisdiction. It then ordered itself dissolved and remanded the case to Judge Weinstein "for such further proceedings as are appropriate." 304 F.Supp. 1354, 1356 (1969). The same day Judge Weinstein issued an order temporarily restraining action under Section 131-a. Four days later he issued a preliminary injunction and denied appellants' motion to stay the injunction. On May 21 this court granted appellants' motion for a preference for their appeal from the order granting the preliminary injunction and denied appellants' motion for a stay without prejudice to renewal at the argument of the appeal. The appeal was argued on June 4, at which time the motion was renewed, and on June 11 this court stayed the injunction pending the disposition of the appeal. On June 16 this court denied appellees' motion to vacate the stay and denied appellants' motion to stay proceedings in the district court until the decision on the appeal from the preliminary injunction. The next day appellees appealed to the United States Supreme Court from the order of dissolution of the three-judge court. The appeal was accompanied by a petition for certiorari before judgment to this court and a motion to expedite Supreme Court consideration of the case. On June 18, while the appeal was still pending in the Supreme Court, the district court granted summary judgment for appellees and issued a permanent injunction. The same day appellants filed a notice of appeal to this court from the issuance of the permanent injunction. On June 19 this court granted appellants' motion to stay the permanent injunction and it also granted appellants' motion to consolidate the appeal from the permanent injunction with the appeal from the temporary injunction. On June 24 the Supreme Court dismissed for want of jurisdiction the appeal from the dissolution of the three-judge court on the ground that the order was properly appealable to this court. The Supreme Court also refused to grant certiorari before judgment and denied appellees' motions to expedite review and to vacate the stays ordered by this court. 395 U.S. 826, 89 S.Ct. 2134, 23 L.Ed.2d 739. Appellees thereupon appealed to this court from the order dissolving the three-judge court, and that appeal was consolidated with the appeals from the injunctions.
 
 II.
 
 7
 We turn first to the issue raised by the appeal from the order of the three-judge court.
 
 
 8
 Appellees urge that the three-judge court erred in dissolving itself and that we should order it to resume its deliberations.
 
 
 9
 The court ordered itself dissolved because of the adoption of an amendment to Section 131-a permitting increased payments to AFDC recipients in Nassau County upon a determination by the Commissioner of Social Services that the increases are required in order to reflect actual cost of living. The three-judge court was of the opinion that the issue raised by the Nassau County plaintiffs was mooted by the amendment to Section 131-a and that the issue presented by the amendment itself was not yet ripe for adjudication.
 
 
 10
 We are persuaded that the court acted correctly. We are confirmed in this view by the fact that, since the dissolution of the three-judge court, the schedule of payments for Nassau County has in fact been increased by reason of the provisions of the amendment to Section 131-a. If corroboration of the opinion of the three-judge court be needed it is provided by this development. Obviously a determination by the court based upon the situation as it existed at the earlier date would have been premature and its decision would have been rendered moot by the provision of the new schedules for Nassau County. The court was right in refusing to act on facts that were fluid and subject to early change. We affirm its order dissolving itself.
 
 III.
 
 11
 Appellants contend that the single district judge erred in exercising jurisdiction to issue a preliminary and a permanent injunction on the basis of the statutory claim after the constitutional claim had become moot and the three-judge court had dissolved itself.
 
 
 Pendent Jurisdiction
 
 
 12
 The three-judge court specifically refused to decide whether it could have exercised pendent jurisdiction to rule on the statutory claim after it had determined that the constitutional claim was moot. 304 F.Supp. at 1356 (1969). In remanding the case to the single district judge for "appropriate" action the court did not decide whether he could exercise such jurisdiction.
 
 
 13
 The single district judge ruled that it was proper for him to assert pendent jurisdiction over the statutory claim. 304 F.Supp. 1356 (1969). We find this conclusion to have been in error.
 
 
 14
 The assertion of a constitutional claim required the convening of a three-judge district court. 28 U.S.C. § 2281 (1964). That court is the only court which ever had jurisdiction over the constitutional claim. Since the single judge at no time had jurisdiction over the constitutional claim there was never a claim before him to which the statutory claim could have been pendent. If the three-judge court had attempted to give the single judge power to adjudicate the statutory claim, it could not have done so, since with the dissolution of the three-judge court the statutory claim was no longer pendent to any claim at all, much less to any claim over which the single judge could exercise adjudicatory power.
 
 
 15
 King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) provides no authority for deciding the pendent statutory claim. There the Court said:
 
 
 16
 "We intimate no views as to whether and under what circumstances suits challenging state AFDC provisions only on the ground that they are inconsistent with the federal statute may be brought in federal courts." Id. at 312 n. 3, 88 S.Ct. at 2131.
 
 
 17
 While the Court in King decided a pendent statutory claim, the constitutional claim to which it was pendent remained viable throughout the litigation. The Court exercised jurisdiction over the pendent statutory claim in order to avoid adjudication of the constitutional issue.
 
 
 18
 Moreover even if we were to accept the overbroad interpretation of the doctrine of pendent jurisdiction urged upon us by appellees, we would hold in the present case that the district judge's exercise of such jurisdiction was an abuse of discretion.
 
 
 19
 In United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), it is clear that there are circumstances in which the exercise of pendent jurisdiction is inappropriate. We believe that it is inappropriate here, where, whatever the technical consequences of enjoining enforcement of Section 131-a may be, the practical effect of an injunction is to order the New York legislature to appropriate more funds for welfare.
 
 
 20
 A federal court should not assert such power over a state legislature unless there is no possible alternative. Even if the district judge had had discretion, he should have refused to rule on the statutory claim.
 
 
 21
 In King v. Smith, supra, the relief granted, enjoining the application of the Alabama "man in the house" regulation, did not have the effect of requiring the state legislature to appropriate additional funds. By invalidating the state regulation, the court substantially increased the number of eligible aid recipients but it specifically noted that Alabama was "free * * * to determine the level of benefits by the amount of funds it devotes to the program." Id. at 318-319, 88 S.Ct. at 2134 (footnote omitted). See Lampton v. Bonin, 299 F.Supp. 336 (E.D.La.1969) (three-judge court).
 
 
 22
 The Department of Health, Education and Welfare is now engaged in a study of the relationship between Section 602(a) (23) and Section 131-a. HEW, with its acknowledged expertise in the field of social security, is far better equipped than the federal courts to review an alleged inconsistency between a complex state statutory scheme for payments in behalf of dependent children and an ambiguous amendment to the Social Security Act. The district court, even if it had power to act on the pendent claim, should have declined to do so, at least until HEW had completed its consideration of the matter.
 
 
 Section 1331
 
 
 23
 The district judge also found that he had jurisdiction to decide the statutory claim under 28 U.S.C. § 1331 (1964) which provides for jurisdiction over federal questions where "the matter in controversy exceeds the sum or value of $10,000 * * *."
 
 
 24
 The district judge properly held that the claims of the members of the class may not be aggregated to satisfy the $10,000 requirement. See Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). He also correctly ruled that "the monetary loss to each of the plaintiffs does not approach $10,000." 304 F.Supp. at 1363. But after finding that appellees could not obtain jurisdiction by showing direct damage of $10,000, the district judge decided that the "indirect damage" they might sustain as a result of their reduced payments was sufficient to satisfy the $10,000 requirement. "Indirect damage" is too speculative to create jurisdiction under Section 1331.
 
 
 25
 "It is firmly settled law that cases involving rights not capable of valuation in money may not be heard in federal courts where the applicable jurisdictional statute requires that the matter in controversy exceed a certain number of dollars. The rule was laid down in Barry v. Mercein, 46 U.S. (5 How.) 103, 12 L.Ed. 70 (1847), a child custody case. The `right to the custody, care, and society' of a child, the court noted, `is evidently utterly incapable of being reduced to any pecuniary standard of value, as it rises superior to money considerations.' 46 U.S. at 120. Since the statute permitted appeals only in those cases where the `matter in dispute exceeds the sum or value of two thousand dollars,' the court concluded that it was without jurisdiction:
 
 
 26
 `The words of the act of Congress are plain and unambiguous * * *. There are no words in the law, which by any just interpretation can be held to * * * authorize us to take cognizance of cases to which no test of money value can be applied.' 46 U.S. at 120.
 
 
 27
 Subsequent decisions have followed this reasoning. See Kurtz v. Moffitt, 115 U.S. 487, 498, 6 S.Ct. 148 29 L.Ed. 458 (1885); First Nat. Bank of Youngstown v. Hughes, 106 U.S. 523, 1 S.Ct. 489, 27 L.Ed. 268 (1882); Giancana v. Johnson, 335 F.2d 366 (7th Cir. 1964), cert denied, 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed. 702 (1965); Carroll v. Somervell, 116 F.2d 918 (2d Cir. 1941); United States ex rel. Curtiss v. Haviland, 297 F. 431 (2d Cir. 1924); 1 Moore, Federal Practice ¶ 0.92[5] (2d ed. 1964)."
 
 
 28
 Boyd v. Clark, 287 F.Supp. 561, 564 (S.D.N.Y.1968), (three-judge court), aff'd on another issue, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969) (footnotes omitted).
 
 
 Section 1343
 
 
 29
 Appellees argue on two grounds that jurisdiction over the statutory claim exists under 28 U.S.C. §§ 1343(3) and (4) (1964). Having found that jurisdiction existed under the doctrine of pendent jurisdiction and under Section 1331, the district judge did not rule on this issue.
 
 Sections 1343(3) and (4) provide:
 
 30
 "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 
 
 31
 * * * * * *
 
 
 32
 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
 
 
 33
 (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."
 
 
 34
 The first contention of appellees is that their claim under the AFDC provisions creates a cause of action under 42 U.S.C. § 1983 (1964), for which jurisdiction is conferred by Sections 1343(3) and (4). Section 1983 states:
 
 
 35
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
 
 
 36
 The complaint, properly read, does not allege the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. The burden of the complaint is that New York's Statute, Section 131-a, is not in conformity with the requirements of Section 602(a) (23) of the federal statutes and that therefore New York is not entitled to receive federal grants under the AFDC program. Plaintiffs have no rights under federal law to any particular level of AFDC payments or, indeed, to any payments at all. See People of State of New York v. Galamison, 342 F.2d 255 (2d Cir.), cert. denied, 380 U.S. 977, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965); Bradford Audio Corp. v. Pious, 392 F.2d 67 (2d Cir. 1968).
 
 
 37
 Moreover, it is clear that the defendant Department of Social Services for the State of New York is not a "person" within the meaning of Section 1983. See Monroe v. Pape, 365 U.S. 167, 187-192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Clark v. Washington, 366 F.2d 678, 681 (9th Cir. 1966); Williford v. People of California, 352 F.2d 474 (9th Cir. 1965). Since the suit here constitutes an attack on a state statute, and not on action taken under it, the plaintiffs' complaint is against the state and not against the Commissioner as an individual. He too is therefore not within the scope of Section 1983.
 
 
 38
 Appellees' second contention is that the Social Security Act, which contains the AFDC provisions, is a law providing for "equal rights" so that jurisdiction exists under Section 1343(3) independently of the existence of any claim under the Civil Rights Act. Section 602 (a) (23) is not designed to secure "equal rights" for purposes of Section 1343(3).
 
 IV.
 
 39
 Although we are persuaded that the district judge had no power to adjudicate this action, we turn to a brief discussion of the merits, since our decision does not rest solely on jurisdictional grounds.
 
 
 40
 Under the AFDC provisions in effect prior to the enactment of Section 602(a) (23),[4] the states, in order to receive grants under the federal program, were required to set a standard of need under which recipients qualified for payments, but they were not required to pay the full standard and in practice many of them did not. See King v. Smith, supra, 392 U.S. at 318-319, 334, 88 S.Ct. 2128. As originally proposed, Section 602(a) (23) would have required each state to pay its full standard of need and to adjust that standard annually in accordance with changes in the cost of living. H.R. 5710, § 202, 90th Cong., 1st Sess. (1967). In the statute as finally adopted both the provision requiring the states to pay their full standard of need and the provision requiring an annual cost of living adjustment in that standard were eliminated.
 
 Section 602(a) (2) now provides:
 
 41
 "§ 602(a) A State plan for aid and services to needy families with children must * * *
 
 
 42
 (23) provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."
 
 
 43
 The appellees contend that the mandated cost of living adjustment requires that all states which, prior to the amendment, were paying benefits equal to their full standard of need must continue to pay their full standard adjusted to reflect the cost of living as of July 1, 1969. In effect, they argue that § 602(a) (23) sets a floor under state AFDC benefits, freezing them at their previous level plus the cost of living adjustment.
 
 
 44
 We believe that Section 602(a) (23) was not intended to have anything like this broad a scope. We read it as making two far less dramatic changes in the law. First, it requires each state to make an adjustment in its standard of need by July 1, 1969, to reflect changes in the cost of living, but does not require any state to pay its standard of need, nor to increase its AFDC payments or to refrain from decreasing them. The second change required by the statute was not intended to affect New York at all. It refers to a practice employed in many states, not including New York, of imposing a maximum on the amount of aid a family may receive, regardless of its size.[5] The statute requires that family maximums of the type imposed by these states are to be adjusted by July 1, 1969, to reflect changes in the cost of living.
 
 
 45
 Our construction of Section 602(a) (23) finds support in the rejection by Congress of the much more stringent bill originally proposed. That rejection demonstrated an intent not to impose controls on the levels of benefits set by the states. The Congressional action was entirely consistent with the traditional federal policy of granting the states complete freedom in setting the level of benefits. See King v. Smith, supra, 392 U.S. at 318-19, 334, 88 S.Ct. 2128.
 
 
 46
 The Conference Report on Section 213 of the bill, which contained the version of Section 602(a) (23) that was enacted, indicates the correctness of a narrow interpretation. In discussing the portion of the pre-Conference version of Section 213 that dealt with certain non-AFDC recipients, the Report states that the Section would have required "each state to adjust its standards for determining need, the extent of its aid or assistance, and the maximum amount of the aid or assistance payable," and thus mandated an increase in aid. However, in explaining the portion of Section 213 that, except for a change from an annual cost of living adjustment to a single such adjustment, became Section 602(a) (23), the Report states only that the bill would require each state to "adjust its standards so as to reflect current living costs and make proportionate adjustments in any maximums on the amount of aid." Conf.Rep. No. 1030, 90th Cong., 1st Sess. (1967,) reprinted in [1967] U.S. Code Cong. and Admin. News, pp. 3179, 3208-3209. The absence of any statement that the portion of Section 213 relating to AFDC payments was intended to effect an adjustment in "the extent of [each state's] aid or assistance" is significant in view of the fact that the immediately preceding discussion of the portion of Section 213 relating to other kinds of assistance refers specifically to such an adjustment in "the extent of * * * aid."
 
 
 47
 The absence in the legislative history of any support for appellees' interpretation of the statute as imposing a floor on payments is especially significant in view of the long-standing Congressional practice of not imposing such restrictions on the states. As HEW said of Section 602(a) (23) in the brief it submitted in Lampton v. Bonin, supra, "The Congress could hardly have paid less attention to it."[6] It is inconceivable that if this were the far reaching measure serving to reverse a basic national policy which plaintiffs claim it was, it should be adopted without comment from committees and individual members of Congress.
 
 
 48
 That Section 602(a) (23) was not intended to have the broad effect urged by appellees is further indicated by the fact that it is not even discussed in the "Summary of Social Security Amendments of 1967," a joint publication of the Senate Committee on Finance and the House Committee on Ways and Means, which was prepared for the use of the two committees by the committee staffs. Similarly the "Summary of Principal Provisions" of the Senate bill contained in the Senate Finance Committee report makes no mention of the provisions that became Section 602(a) (23). S.Rep. No. 744, 90th Cong., 1st Sess. (1967), reprinted in [1967] U.S. Code Cong. and Admin. News, pp. 2834, 2840.
 
 V.
 
 49
 We find that the only obligation imposed on New York by Section 602(a) (23) is that sometime between January 2, 1968, the effective date of Section 602 (a) (23), and July 1, 1969, the deadline imposed by the Section, it must adjust its standards of need to reflect the cost of living. The schedules in Section 131-a are based on prices as of May, 1968. Thus New York has complied with Section 602(a) (23).
 
 
 50
 The two injunctions are vacated and the decision granting summary judgment for appellees is reversed. The order of the three-judge court dissolving itself is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Law of March 30, 1969, ch. 184, § 5 [1969 McKinney's Session Laws of New York, pp. 215, 217]
 Subsections 1-3 of Section 131-a provide:
 131-a. Maximum monthly grants and allowances of public assistance
 
 
 [1]
 Any inconsistent provision of this chapter or other law notwithstanding, social services officials shall provide home relief, veteran assistance, old age assistance, assistance to the blind, aid to the disabled and aid to dependent children, to eligible needy persons who constitute or are members of a family household, in monthly or semi-monthly allowances or grants in accordance with standards established by the regulations of the department, but not in excess of the schedules included in this section, less any available income or resources which are not required to be disregarded by other provisions of this chapter. Such schedules shall be deemed to make adequate provision for all items of need in accordance with the provisions of section one hundred thirty-one, exclusive of shelter and fuel for heating, for which two items additional provision shall be made by the social services districts in accordance with the regulations of the department
 
 
 [2]
 The following schedule of maximum monthly grants and allowances shall be applicable to the social services district of the city of New York:
 Number of Persons in Household
 One Two Three Four Five Six Seven
 $70 $116 $162 $208 $254 $297 $340
 For each additional eligible needy person in the household there shall be an additional allowance of forty-three dollars monthly.
 
 
 [3]
 The following schedule of maximum monthly grants and allowances shall be applicable to all other social services districts:
 Number of Persons in Household
 One Two Three Four Five Six Seven
 $60 $101 $142 $183 $224 $257 $290
 For each additional eligible needy person in the household there shall be an additional allowance of thirty-three dollars monthly.
 
 
 [2]
 Social Security Amendments of 1967, Pub.L.No. 90-248, § 213(b), 81 Stat. 821, 898 (codified in 42 U.S.C. § 602(a) (23) (Supp. IV 1965-68))
 
 
 [3]
 Law of May 9, 1969, ch. 411, § 1 [1969 McKinney's Session Laws of New York, pp. 652-53]
 
 
 [4]
 See note 2,supra.
 
 
 [5]
 Maine, for example, provides $27 per month for each child after the first but permits a family to receive a monthly grant of no more than $250. See Westberry v. Fisher, 297 F.Supp. 1109 (D. Me.1969), where a three-judge district court ruled that the Maine regulation imposing a family maximum violated the equal protection clause of the Fourteenth Amendment. See also Williams v. Dandridge, 297 F.Supp. 450 (D.Md.1968, 1969) (three-judge court)
 
 
 [6]
 HEW's brief expresses agreement with our view on the fundamental proposition that Section 602(a) (23) did not mandate increases nor freeze floors, but left the states free to reduce AFDC payments. However, the HEW analysis differs from ours in some respects
 
 
 LUMBARD, Chief Judge (concurring):
 
 51
 I concur in the result.
 
 
 52
 While I agree with much of Judge Hays' opinion our differences on some issues necessitate this separate statement.
 
 
 53
 I rest my concurrence on the ground that the district court abused its discretion in rendering judgment on the pendent claim.
 
 
 54
 The district court, in my view, did have pendent jurisdiction over the statutory claim in the sense of judicial power. The Supreme Court has held that power exists "in the federal courts" to decide a pendent claim when, (1) it is joined to a constitutional claim which is not insubstantial, and, (2) the nature of the pendent and constitutional claims are such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Both of these tests are satisfied in this case.
 
 
 55
 The fact that the three-judge court declared the constitutional claim moot and thereupon dissolved itself, referring the proceedings back to the single judge district court, did not deprive the district court of pendent jurisdiction. Pendent jurisdiction, in the sense of judicial power, attaches at the outset of a suit. See United Mine Workers v. Gibbs, 383 U.S. 715, 727, 86 S.Ct. 1130 (1966). The subsequent dismissal of the constitutional claim, Gibbs makes clear, does not deprive the federal courts of all power over a properly joined pendent claim. What it does do is to mandate a reassessment by the three-judge court, or by the single district judge upon referral by the court, of the propriety of proceeding further on the pendent claim. The question becomes one of discretion, and not of judicial power in the strict sense. See id. at 726-727, 86 S.Ct. 1130.
 
 
 56
 I know of no authority which prohibits a three-judge court, after it has disposed of a constitutional claim, from referring any remaining pendent claims to a single judge for appropriate disposition. A flat prohibition on such references does not recommend itself from the standpoint of judicial convenience and economy, for often a single judge will be able to dispose of the pendent claims more expeditiously than the cumbersome three-judge court machinery. Of course, the three-judge court might well have dismissed the pendent claim, but, for reasons which are not stated, it did not do so.
 
 
 57
 In any event, the propriety of the single judge's decision concerning whether or not to proceed to judgment on a pendent claim is subject to review for abuse of discretion, and that is the issue I find squarely presented in this case.
 
 
 58
 There is force to Judge Hays' suggestion that one factor relevant to the exercise of the district court's discretion is the nature of the remedy sought by plaintiffs. Here the remedy was extreme: an injunction against the operation of a welfare program under a state statute. Congress established the three-judge court mechanism to insure that a state statute would not be enjoined on constitutional grounds simply on the decision of a single judge. While a three-judge court is not required when an injunction is sought on statutory grounds, as here, nonetheless the extreme nature of the injunction remedy against the state weighs heavily against the adjudication of a pendent claim by a single district judge. This is particularly true in a case such as this, where the constitutional claim had been dismissed well before a decision on the merits, and thus there had not been a substantial investment of federal judicial resources in the case as a whole at the time of the reference of the pendent claim to the single judge. Cf. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130 (1966), holding that pendent state claims should be dismissed if the constitutional claim is dismissed before trial.
 
 
 59
 It is true that the pendent claim in this case is founded upon federal law, thus making the exercise of jurisdiction by a federal court less objectionable than if the claim arose under state law. But here, as Judge Hays points out, the federal claim seems more apt for initial resolution by the Department of Health, Education and Welfare, than by the courts. The two issues upon a resolution of which this claim turns — the practical effect of § 131-a and the proper construction of § 602(a) (23) of the Social Security Act — both are exceedingly complex. The briefs and arguments of the parties, and the varying judicial views they have elicited, have demonstrated the wisdom of allowing HEW, with its expertise in the operation of the AFDC program and its experience in reviewing the very technical provisions of state welfare laws, an initial opportunity to consider whether or not § 131-a is in compliance with § 602(a) (23).[1] This is HEW's responsibility under the Social Security Act, see 42 U.S.C.A. § 1316 (Supp.1969). I believe that the district court should have declined to exercise its jurisdiction, thus permitting HEW to determine the statutory claim asserted by plaintiffs, for the Department already had initiated review proceedings concerning § 131-a. The Department's determination, it should be noted, will be reviewable in the courts at the instance of either the state, under 42 U.S.C. § 1316 (a) (3) (Supp.1969), or the plaintiffs under the Administrative Procedure Act.
 
 
 60
 While I agree with Judge Hays' treatment of the jurisdictional issue raised under 28 U.S.C. § 1331, we differ somewhat with respect to the application of 28 U.S.C. § 1343(3) and (4). I do not find that the plaintiffs' claim under § 602(a) (23) involves the redress of either "equal rights" or a "civil right" as those terms are used in § 1343. I do not believe that the claim, although one founded on a federal right, falls within the ambit of 28 U.S.C. § 1983, for it lacks the constitutional overtones that have been present in all the welfare cases cited by the plaintiffs which have been sustained under that section. But even if a broad reading of § 1983 is accepted it cannot change the nature of the plaintiffs' claim for the purposes of § 1343. On its face it is clear that § 602(a) (23) has nothing to do with "equal rights," and it also cannot be said to involve a "civil right" in view of the circumstances which gave rise to the enactment of § 1343(4) in 1957. See U.S.Code Cong. & Adm.News, 85th Cong. (1957), pp. 1966, 1976, H.R.Rep.No. 291.
 
 
 61
 Since I do not feel that the federal courts are the appropriate forum for the initial resolution of plaintiffs' statutory claim, I do not reach the merits of that claim. At the same time, I should add that Judge Feinberg's view of the merits does not persuade me.
 
 
 
 Notes:
 
 
 [1]
 In King v. Smith, 392 U.S. 309, 88 S.Ct. 2128 (1968), a case much relied on by plaintiffs, HEW had already given notice to the state that its regulation did not conform to the requirements of federal law. 392 U.S. 326 n. 23, 88 S.Ct. 2128. Thus the challenge to the regulation made in theKing suit was ripe for resolution by the courts.
 
 
 FEINBERG, Circuit Judge (dissenting):
 
 62
 The decision in this case allows the State of New York to receive millions of federally granted dollars and then proceed to ignore the federal law granting them by reducing payments to thousands of welfare recipients already living at a bare subsistence level. This result follows from a restrictive interpretation of the district court's jurisdiction and allowable discretion and of the meaning of the applicable federal statute. I respectfully but emphatically dissent.
 
 
 63
 Because of the differences in the opinions of my brothers, it is necessary to describe them precisely. As I understand it, they agree that the three-judge court properly dissolved itself. Judge Hays rules that the single judge thereafter had no jurisdiction; Chief Judge Lumbard is of the view that the single judge had the power to decide the case, but agrees with Judge Hays that it was an abuse of discretion to do so. Finally, Judge Hays decides that section 131-a of the New York Social Services Law does not conflict with the 1967 amendment of the Social Security Act referred to as section 602(a) (23). Chief Judge Lumbard does not deal with the merits, although he finds unpersuasive the interpretation of section 602(a) (23) contained in this dissenting opinion. I dissent from the holdings that the single judge lacked jurisdiction or abused it, and that section 131-a does not conflict with section 602(a) (23). Discussion of the propriety of dissolution of the three-judge court is deferred to point III below. I turn first to the question of the jurisdiction of Judge Weinstein to grant plaintiffs relief.
 
 I. Jurisdiction of the single judge.
 
 64
 On this aspect of the case, the issue is whether the United States District Court for the Eastern District of New York had jurisdiction to determine whether federal funds were about to be spent in a manner that would violate a federal statute. Thus stated, the question begs for resolution in a federal court, rather than in a state forum as appellants contend. Moreover, the formidable intricacies of three-judge court procedure should not be allowed to obscure this basic issue.
 
 
 65
 The district court judge originally convened a three-judge court on April 24, 1969, plaintiffs' complaint having challenged section 131-a of the New York Social Services Law on two main grounds: first, denial of equal protection of the laws because residents of Nassau County would be discriminated against by new payment schedules below those for residents of New York City, and second, conflict with a federal statute, 42 U.S.C. § 602(a) (23). Thereafter, the three-judge court held a hearing. While the issues were before it, the New York State legislature adopted an amendment to section 131-a, which the three-judge court felt rendered the equal protection claim moot. Accordingly, that court dissolved itself on May 12, 1969, and remanded the matter back to the single judge. On May 15, Judge Weinstein issued his opinion and on May 16, his order from which appeal has been taken.
 
 
 66
 Judge Weinstein's conclusion that he had jurisdiction was based upon two theories: that jurisdiction to decide the federal statutory claim was pendent to the federal constitutional claim and that jurisdiction also existed under 28 U.S.C. § 1331. He noted that there might also be independent jurisdiction over the federal statutory claim under 28 U.S.C. § 1343(3), but found it unnecessary to decide that question. I agree with the district court judge that pendent jurisdiction existed even though the federal constitutional claim of denial of equal protection had been eliminated from the case. I reach this conclusion by either of two routes.
 
 
 67
 A. Assume that the jurisdiction exercised over the statutory claim was that of the three-judge court. In King v. Smith, 392 U.S. 309, 88 S.Ct. 2128 (1968), the Supreme Court made clear that when a federal constitutional claim and a federal statutory claim are joined together, the three-judge court has power to decide the latter. In fact, that is what the Supreme Court did, putting aside the constitutional issue. It is true that in footnote 3, the Court said (392 U.S. at 312, 88 S.Ct. at 2131):
 
 
 68
 We intimate no views as to whether and under what circumstances suits challenging state AFDC provisions only on the ground that they are inconsistent with the federal statute may be brought in federal courts. See generally Note, Federal Judicial Review of State Welfare Practices, 67 Col.L. Rev. 84 (1967).
 
 
 69
 However, that referred to a suit brought only on the statutory ground, a situation not present in that case or here. Indeed, in Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80-81, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960), the Court said that a properly convened three-judge court has jurisdiction "over all claims" raised against a state statute. The footnotes in that opinion at pp. 81-82, 80 S.Ct. at p. 574, make clear that the quoted phrase applies not just to claims based upon a federal statute but even to "local questions" arising under a state constitution and to "every question involved, whether of state or federal law." Therefore, if the three-judge court in this case was properly convened, as it said it was, it had the power to decide the statutory claim. It chose not to do so on its theory that the constitutional claim had become moot, stating:
 
 
 70
 We need not consider the now academic question of whether the three-judge court might, in the exercise of its pendent jurisdiction, have decided the alleged statutory issue either before it considered the alleged constitutional issue or after it decided the constitutional issue against the plaintiffs. Cf. King v. Smith, 392 U.S. 309, 312 n. 3, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Under the circumstances of this case there is no reason for continuing the three-judge court.
 
 
 71
 Thus, it is not clear whether the court thought it could or could not exercise pendent jurisdiction, or whether it was deciding that no judge should exercise that jurisdiction or was leaving the question for the single judge. In any event, the matter was remanded back to the single judge "for such further proceedings as are appropriate." Therefore, Judge Weinstein was left with the possibility that the pendent jurisdiction he said that he exercised was that of the three-judge court passed back to him. Cf. Landry v. Daley, 288 F.Supp. 194 (N.D.Ill.1968). If he was exercising that jurisdiction, then under the cases cited above his power to do so was clear, unless the mootness of the constitutional claim prevented him, an issue discussed further below.
 
 
 72
 B. Assume, however, that because the three-judge court has been dissolved the case must be considered on the theory that the pendent jurisdiction allegedly exercised was only that of the single judge district court. Both the constitutional and statutory claims were in the complaint as originally filed. Judge Weinstein convened the three-judge court to consider both but pointed out that if it should subsequently be determined that a three-judge court was not required, "the single judge's decision, as part of that three-judge court, would become the opinion of the Court." When the complaint was filed, the federal constitutional claim of denial of equal protection of the laws was not frivolous and clearly fell within the jurisdictional language of 28 U.S.C. § 1343(3), since it sought to redress the deprivation, under color of a state law, of a right secured by the Constitution. The substantive statutory basis for the action was 42 U.S.C. § 1983. Insofar as the constitutional claim is concerned, the only reason for a three-judge court was that plaintiffs sought to enjoin the "enforcement, operation or execution" of a state statute. 28 U.S.C. § 2281. That did not change the jurisdictional basis; it was a concomitant of the relief sought. At the time the complaint was filed, Judge Weinstein had sufficient "jurisdiction" over the constitutional claim to grant a temporary restraining order, 28 U.S.C. § 2284(3), as indeed he did. It is unnecessary to speculate whether in appropriate circumstances the single judge could have, on the basis of the constitutional claim, granted damages against defendant Wyman in an individual capacity[1] or issued a declaratory judgment to plaintiffs if they had limited themselves to the two prayers for declaratory relief in the complaint instead of adding another for injunctive relief as well.[2] In fact, plaintiffs took the position before Judge Weinstein that a three-judge court was not required because, inter alia, declaratory relief was sought. While Judge Weinstein thought that the request for injunctive relief made a three-judge court necessary, it is not accurate to say that he had no jurisdiction over any aspect of the constitutional claim when the complaint was filed. If such jurisdiction did exist — and I believe that it did — a closely related statutory claim could also be decided by a single judge under the general principles of pendent jurisdiction, liberally construed in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966).[3] Therefore, Judge Weinstein had pendent jurisdiction over the federal statutory claim at the time the case first came before him. It may even be — although it is not necessary to resolve that issue — that the judge could have acted upon plaintiffs' suggestion that he decide the statutory issue first and convene the three-judge court later, if necessary. Cf. Kelly v. Illinois Bell Telephone Co., 325 F.2d 148 (7th Cir. 1963); Chicago, Duluth & Georgian Bay Transit Co. v. Nims, 252 F.2d 317 (6th Cir. 1958); but cf. Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568 (1960). The judge declined that invitation not because he thought he lacked the power to so rule but because he felt that convening the three-judge court would avoid "costly" delay.
 
 
 73
 The crucial question on either theory A or B is whether the elimination thereafter of the constitutional claim as moot necessarily divested the district court of jurisdiction it already had. In United Mine Workers v. Gibbs, supra, the Court did say, 383 U.S. at 726, 86 S.Ct. at 1139:
 
 
 74
 Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.
 
 
 75
 But the Court spoke there in the context of a federal against a state claim. The point here is that the alternative claim to which pendent jurisdiction attached was not a state claim at all, but a claim based upon a federal statute. Moreover, the dismissal of the constitutional claim here did not occur "before trial" but after Judge Weinstein and the three-judge court had spent days in taking evidence and hearing argument on the motion for an injunction. Indeed, Judge Weinstein issued a preliminary injunction only three days after dissolution of the three-judge court and without any further hearing. Moreover, appellants concede that, in effect, at that point a full trial had been held.[4] Certainly there have been instances where pendent jurisdiction has been allowed to continue even though the basic federal jurisdictional claim has been denied, see, e. g., Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers v. Meadow Creek Coal Co., 263 F.2d 52, 59-60 (6th Cir.), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959); Travers v. Patton, supra, 261 F.Supp. 110, at 116; cf. Murphy v. Kodz, 351 F.2d 163 (9th Cir. 1965), or mooted. Hazel Bishop, Inc. v. Perfemme, Inc., 314 F.2d 399 (2d Cir. 1963).
 
 
 76
 The reasons Judge Weinstein gave for retention of jurisdiction were as follows:
 
 
 77
 The pendent claim does not involve state law alone, but poses crucial and important questions of federal statutory law. It vitally affects a national program designated to protect the fundamental rights of children to the sustenance and stable family life which will enable them to develop into full members of our society capable of exercising their rights and responsibilities under the United States Constitution and it involves the expenditure of billions of dollars of federal monies. The courts in the federal system are in at least as good a position as state courts to adjudicate this question of federal law. Nor can this be described as a petty or unimportant controversy of the kind Congress sought to exclude from the federal courts.
 
 
 78
 * * * * *
 
 
 79
 A speedy determination of this litigation is highly desirable. From the point of view of the plaintiffs, an unnecessary reduction of their benefits may reduce their income below subsistence level, causing grievous harm. From the state's vantage point, an unnecessary extension of any temporary restraining order preventing institution of the new reduced benefits would, according to the testimony of a Deputy Commissioner in the State Department of Social Services, result in a loss to the state of up to ten million dollars a month. Dismissal, under the abstention doctrine, would require plaintiffs to commence a new suit in the state courts. Resulting loss of time would make it impossible to decide the issues before administrative arrangements must be made to implement the new state statute by its effective date — July 1, 1969.
 
 
 80
 Furthermore, the parties have already presented substantial testimony, affidavits and briefs to the Court. The expenditure of time by the litigants and the Court would be, to a large extent, wasted were all these materials to be offered anew in a state court.
 
 
 81
 These were compelling considerations. Whether pendent jurisdiction exists depends in part upon the same reasons which justify its exercise. On these facts, jurisdiction was justified by the saving of judicial time once the case had gone as far as it had, by concern for fairness to the litigants, and by the appropriateness of having a federal court decide the issue whether congressional conditions to receipt of federal funds are met. See Note, UMW v. Gibbs and Pendent Jurisdiction, 81 Harv.L.Rev. 657, 664-71 (1968). It should also be noted that a three-judge court in Texas, faced with a similar issue, has apparently just ruled for plaintiffs in that action on the basis of the same federal statute involved here, while also denying various federal constitutional claims. Jefferson v. Hackney, 304 F.Supp. 1332 (N.D.Texas, July 1, 1969) (opinion to follow judgment).
 
 
 82
 Various other arguments regarding the exercise of discretion by the district court remain to be answered. The contention is made that the pendency of an administrative proceeding by the Secretary of Health, Education and Welfare made the district court action "premature" or inappropriate. That "proceeding" was apparently pending in April, and we are not favored with any indication of HEW action other than its request to New York State for further information. The delays inherent in HEW review and the difficulty of obtaining effective exercise by HEW of any sanction were obvious in King v. Smith, 392 U.S. 309, 326 n. 23, 88 S.Ct. 2128 (1968), in which the Court professed no qualms over deciding the issue of construction of the Social Security Act then before it, although HEW had not acted definitively. Cf. Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 91-92 (1967). In view of the overpowering justification for Judge Weinstein's exercise of discretion to decide the statutory issue, I would not regard the speculative possibility of HEW action as a ground for reversal. If plaintiffs are correct on the merits, as I believe them to be, they will continue to suffer severe and possibly irreparable injury for an indeterminate length of time while HEW studies the problem and negotiates with the state. At the very least, therefore, even under the point of view of the majority, the court should exercise its jurisdiction to the extent of enjoining the operation of the New York statute pending completion of HEW proceedings.
 
 
 83
 Nor do I agree with the suggestion that the action of the district court was improper because it in effect ordered the state to appropriate additional funds. The district court's holding merely establishes that New York must meet the federal conditions requisite to participation in the federal program or cease its participation. Such a ruling is neither improper nor unprecedented. Thus, a number of courts have recently determined that state maximums on the amount of aid to AFDC families were invalid as violating the equal protection clause or the Social Security Act or both. In at least two of these cases the courts took pains to point out that they were not affirmatively ordering the respective states to appropriate additional funds but only holding that if the states had appropriated insufficient funds to meet the total need they could not "correct the imbalance" by applying the invalid maximums. Dews v. Henry, 297 F.Supp. 587, 592 (D.Ariz.1969); Williams v. Dandridge, 297 F.Supp. 450, 459 (D.Md. 1968); cf. Westberry v. Fisher, 297 F. Supp. 1109, 1116 (D.Maine 1969). The majority opinion distinguishes King v. Smith, supra, because it "did not have the effect of requiring the state legislature to appropriate additional funds." It is true that the Court there emphasized the latitude of a state in setting "its own standard of need and * * * level of benefits," 392 U.S. at 318, 88 S.Ct. at 2134, but the effect of section 602(a) (23) was not involved in that case. Moreover, I do not believe that either King v. Smith or Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), which deals with residency requirements, would have been decided differently even if it had been assumed — and the assumption seems logical — that the rulings would increase the expense to a state. In the latter decision, the Court noted that "appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot be an independent ground for an invidious classification." Id. 89 S.Ct. at 1330 (footnote omitted). In any event, were it necessary, we could follow the example of the three-judge court judgment in Jefferson v. Hackney, discussed above, which stayed the injunction of the invalid Texas statute for 60 days in order to give the state an opportunity to implement a plan conforming to the requirements of the federal statute. While it may be likely that New York would in fact decide to appropriate additional funds rather than to take some other course of action, that probability is not equivalent to the judicial usurpation of state legislative functions.
 
 
 84
 Finally, the point is made that a single judge somehow abuses his discretion by enjoining a state statute on the ground that it conflicts with a federal statute. If all that is meant is that it would have been better for three judges rather than one to have ruled on the statutory claim in this case, I agree. The three-judge court had that claim before it and should have decided it rather than dissolving. See point III below. However, if the point is that the single judge in granting injunctive relief thereafter abused his discretion merely because he was a single judge, I disagree. Congress has made the decision not to require three judges when the claim for injunctive relief is based on a federal statute rather than on the Constitution. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed. 2d 194 (1965). Whatever may be the merits of a contrary point of view — see Currie, The Three-Judge Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 55-64 (1964) — the change should now come from Congress.
 
 
 85
 Thus, I conclude that Judge Weinstein had pendent jurisdiction over the statutory claim whether that jurisdiction be of the three-judge court or a single judge court. Jurisdiction was not lost because the constitutional claim became moot. The judge did not abuse his discretion by deciding the statutory claim on the merits. On this theory, it is not necessary to decide whether, as appellees contend, there would be jurisdiction under 28 U.S.C. § 1343(3) or (4) over a case brought on the statutory claim alone. See Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 111-15 (1967). Finally, it is equally unnecessary to decide whether Judge Weinstein was correct in holding that there was jurisdiction under 28 U.S.C. § 1331.
 
 
 86
 Under the rulings of my brothers, the procedural labyrinth of the three-judge court has swallowed up a substantial claim that thousands of AFDC recipients in New York State will be greatly harmed by the violation of a federal statute. The United States District Court for the Eastern District of New York originally had jurisdiction over that claim. Thereafter, the three-judge court was properly convened, according to its own statement, and continued to have that jurisdiction. That court never denied that it could exercise such jurisdiction and did not reject it. Yet, the jurisdiction which both the single judge court and then the three-judge court had has now somehow magically disappeared or is inappropriate for exercise. I dissent from this grudging assessment of the jurisdiction and discretion of the district court.
 
 II. Legality of section 131-a.
 
 87
 Since Judge Hays not only holds that the district court lacked jurisdiction to determine the substantive issues raised in the case before us, but also expresses his views on the merits, I will set forth my reasons for dissenting on that issue as well. This requires an analysis of the interaction of the federal statute, section 602(a) (23), and the New York statute, section 131-a.
 
 
 88
 Basic to analysis of the fundamental clash between the two statutes is an understanding of how the program of Federal Aid to Families with Dependent Children (AFDC) operates. The AFDC program is over 30 years old and no state is required to participate in it. But all do and receive payments from the federal government in varying amounts on a matching fund basis. Thus, in New York, 50 per cent of all funds paid to "needy dependent children and the parents or relatives with whom they are living," 42 U.S.C. § 601, is provided by the federal government. Clearly, then, there is an overwhelming federal interest in the administration of the AFDC program in New York, since the state and the federal government pay for it equally.[5] While administration of the AFDC program is left to the individual states, each state's plan for payments must be approved by the federal government and must meet the requirements of the Social Security Act, 42 U.S.C. § 602.
 
 
 89
 To take advantage of federal AFDC payments, each state must set forth a standard of need and provide a level of benefits based upon this standard. 45 C.F.R. § 233.20(a) (2) (i), 34 Fed.Reg. 1394 (1969). The standard of need is determined by adding together the cost of those items deemed necessary for subsistence. As might be expected, both the standard of need and the benefits actually paid vary in content and amount. As to the former, judgments vary in the several states as to what items are necessary for subsistence and what they cost. As to the latter, some states pay 100 per cent of what is defined as the standard of need,[6] while others pay an amount which is less than the standard of need, either by fixing benefits at a percentage of that standard, or by imposing a flat maximum on the amount of benefits to a family. New York has paid 100 per cent of the standard of need, as it defines it, and still purports to follow that course.
 
 
 90
 It is against this background that we must assess the effect of congressional enactment in 1967 of section 602(a) (23), which requires of each state's AFDC plan that it:
 
 
 91
 provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.
 
 
 92
 The critical flaw in appellants' arguments is that they unavoidably require accepting the proposition that in enacting section 602(a) (23) Congress was engaging in a virtually meaningless exercise of ineffectual verbiage. Simply stated, under the proffered interpretation of this legislation, if at some time between January 2, 1968, the date the section became law, and July 1, 1969, a state has complied with the statute's direction that
 
 
 93
 the amount used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs * * * and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted
 
 
 94
 the state has at once fully satisfied the congressional requirement and is thereafter free promptly to nullify the adjustment and reduce its AFDC payments back to their original levels or, as in the case of New York State, to substantially lower levels. This hypothesis, inherent in appellants' position, makes a mockery of congressional purpose.
 
 
 95
 It may be useful to summarize just what the State of New York has done. In August 1968, the Department of Social Services, pursuant to its usual practice, adjusted its standard of need to reflect the rise in the cost of living as determined by a survey it had previously conducted. Even if this initial increase was sufficient "to reflect fully" cost of living changes, however, any attempt at compliance with section 602(a) (23) was vitiated by the passage thereafter of section 131-a of the New York Social Services Law. That section not only wipes out the modest increases of August 1968, but effects additional and very substantial reductions in welfare benefits to the great majority of AFDC recipients. First, the amounts of the regular, recurring payments to families of specific sizes for their fundamental needs are no longer related to the actual age of the oldest child in each family but are standardized sums based on a mean age of the oldest child in all recipient families of that size, an adjustment which results in sharp reductions in regular grants to many families with older children. In addition, "flat grants" to cover major expenditures for clothing and home furnishings are substantially abolished and almost all previously existing "special grants" to cover extraordinary individual needs such as medically-dictated special diets, maternity expenses, homemaker services, and the like are eliminated.
 
 
 96
 The district judge concluded that the actual impact of these changes was "substantial." For example, he found that the new law was "a subterfuge to enact drastic cuts in both the standard of need and level of payment"; that in New York City the net effect of the law will result in increases in assistance to 245 families and decreases to approximately 173,900 families; and that "the decrease in total AFDC payments under the New York State program is no less than $75,000,000" annually. On the evidence before the district court, these findings were justified and were surely not "clearly erroneous." Indeed, my brothers do not challenge them. While appellants originally took the position before us that there was no real reduction in the standard of need, no amount of linguistic acrobatics or technical rationalizations can disguise the glaring fact that the state is critically reducing AFDC standard of need and payments. The crucial question is whether doing so violates a congressional directive contained in section 602(a) (23).
 
 
 97
 Before consideration of that issue it is helpful again to focus on the basic concepts here involved. There are a number of hypothetical ways for a state to affect welfare payments. It can raise or reduce its standard of need, concluding that a greater or lesser sum is sufficient for subsistence. Whether it pays as benefits 100 per cent, or some lesser percentage, of that standard of need, a change in the standard changes the actual payments. A state can also keep its standard of need constant, but change the percentage of that standard which it will pay. Or a state can leave both its standard of need and level of benefits intact in theory, but impose a flat dollar maximum on the amount going to any one family or adjust the amount of an existing maximum. Section 602(a) (23) refers to changes in "amounts used * * to determine * * * needs" or in "maximums * * * on the amount of aid paid"; it does not specifically refer to a change in the percentage of the standard of need that a state pays.
 
 
 98
 I come now to the question of what section 602(a) (23) was designed to accomplish. The language clearly calls for an increase in standards of need and in dollar maximums to take account of an increase in the cost of living of which Congress, like the rest of us, was clearly aware. Ordinarily, an increase in either would cause an increase in money benefits paid out by the state. However, this effect could immediately be negated by any of the devices described above, i. e., by then reducing the standard of need after having increased it, or by reducing the percentage of benefits paid, or by reducing dollar maximums. New York has utilized the first technique and appellants would attribute to Congress the intention of requiring an increase in the standard of need but not caring whether it is thereafter promptly reduced. Even the brief of the United States Department of Health, Education and Welfare, relied on in footnote 6 of the opinion of Judge Hays, appears to balk at such outright nullification of section 602(a) (23).[7] Appellants' position attributes to Congress an intention to appear as though it were accomplishing a result which it knew was not being achieved. I am reluctant to presume that to be the case. The language of section 602(a) (23) means something, it certainly calls for an increase in standard of need, thereby suggesting an increase in benefits, and I do not see why it also simultaneously suggests its own nullification. The legislative history relied on by Judge Hays is inconclusive. It shows that the administration bill originally sought a greater increase in benefits (a requirement that all states pay 100 per cent of need) and an annual cost of living adjustment. That something less emerged does not prove that nothing at all was done; if anything, it tends to show the reverse. Appellants argue that Congress could not have enacted even a temporary "floor" on benefits with so little discussion. But undoubtedly such instances have occurred before. While of some weight, the absence of discussion can hardly be controlling. In his opinion granting the preliminary injunction Judge Weinstein painstakingly outlined the progress of section 602(a) (23) through Congress in reaching his determination as to the congressional purpose behind it. He noted that the inadequacy of present welfare payments throughout the states was repeatedly stressed as the motivation for the proposed legislation, and that although additional provisions originally proposed with the section were dropped, the wording of the basic requirements of section 602(a) (23), and presumably the purpose behind it, emerged virtually unchanged.[8]
 
 
 99
 Section 602(a) (23) is now the subject of litigation in a number of courts. Prior to this case, the only other federal judge who has undertaken an analysis of the section concluded that it prevented a cut in benefits. In Lampton v. Bonin, 299 F.Supp. 336 (E.D.La.1969), a three-judge court was convened to determine the validity of a ten per cent reduction in AFDC grants by the Louisiana Department of Welfare, which plaintiff recipients attacked on a number of grounds, among them that the reduction violated section 602(a) (23). In a decision rendered in April 1969, two of the three judges held that the question was premature, since the state had until July 1, 1969 to comply with the statute. 299 F.Supp. at 349. In a lengthy dissent, Cassibry, J., did reach the merits of the issue, and concluded that the section prohibited any reduction in benefits even before July 1.
 
 
 100
 Congress necessarily intended to maintain at least the status quo by setting a floor below which ADC payments could not be reduced, which is certainly the level of ADC payments on January 2, 1968, the base figure from which the increases required by section 402(a) (23) [section 602(a) (23)] are to be determined. Though this prohibition on reductions is not expressly stated in the statute, it is necessarily implied, for any other conclusion is "plainly at variance with the policy of the legislation as a whole."
 
 
 101
 * * * * * *
 
 
 102
 ADC payments in all states are predicated upon the need standard; if this standard is increased, as section 402 (a) (23) requires, the budgetary deficit must also increase accordingly. In those states paying the budgetary deficit in full, as well as in those states that pay only a percentage of the budgetary deficit (or the standard of need), section 402(a) (23) necessarily requires increased ADC grants correspondent to the increase in the standard of need, for a percentage maximum (100 percent or less) kept constant automatically translates increased need into an increased payment. Similarly, in those states imposing an arbitrary dollar maximum on the size of the assistance grant, section 402(a) (23), by requiring that the maximums imposed be adjusted in accordance with the change in the cost of living, insures increased grants for all recipients. Regardless of which system of computing ADC payments the state follows, section 402(a) (23) is therefore designed to effectuate increased ADC recipient grants. The language of the statute could not be any clearer. 299 F.Supp. at 348.[9]
 
 
 103
 More recently, a three-judge court in Texas considered the issue whether a cut in AFDC benefits violated section 602(a) (23). Although the opinion of the court has not yet issued, its judgment has; the latter indicates that the court unanimously concluded that a reduction in benefits violates the federal statute. Jefferson v. Hackney, 304 F. Supp. 1332 (N.D.Texas, July 1, 1969).[10]
 
 
 104
 In both cases, the statutory issues were whether Congress intended by section 602(a) (23) to put at least some floor under welfare payments, and whether the state statute ran counter to that intention. In neither instance did the state legislation reduce a standard of need; rather, the mechanism used to lower benefits was primarily a reduction in the percentage of payment applicable to that standard.[11] Even though that legislative device is not mentioned at all in section 602(a) (23), both Judge Cassibry and apparently the Texas court felt that the federal statute prevented indirect as well as direct evasions of congressional intent. In this case, the action of the State of New York is in even sharper conflict with section 602(a) (23) because, according to the trier of fact, New York has done the one thing that the section is undeniably designed to prevent; i. e., the State has directly reduced the standard of need despite the admonition of the section to adjust that standard "to reflect fully changes in living costs." Indeed, New York has reduced the standard — and therefore the benefits paid — to a level below the standard in effect for most recipients before any cost of living adjustment.
 
 
 105
 I do not suggest that the meaning and effect of section 602(a) (23) are unmistakably clear. But, on balance, I think that its language and the legislative history relied on by Judge Weinstein show that Congress intended AFDC payments throughout the country to be increased somewhat to reflect the rise in the cost of living and that the levels of payments so adjusted were to remain stationary at least pending further congressional action. That this intention was far from unreasonable is sufficiently demonstrated by the fact, supported by ample evidence on the record below, that even in New York State, which has one of the highest levels of AFDC benefits in the United States, AFDC recipients live at or below a bare subsistence level. Accordingly, I conclude that since New York has not complied with section 602(a) (23) properly read, the injunction was justified.
 
 III. Dissolution of the three-judge court.
 
 106
 The last issue concerns the appeal from dissolution of the three-judge court. I think that there is a very substantial question as to whether the court was correct in holding that the amendment to section 131-a rendered plaintiffs' constitutional claim either "moot" or "unripe." Plaintiffs very persuasively argue that the only effect of the amendment was to grant purely discretionary administrative power to increase the level of Nassau County payments and that the mere possibility that such discretion might be exercised to cure an allegedly prohibited discrimination is far from sufficient to void the constitutional issue. Nor is it at all clear that the subsequent increase of the Nassau County payment schedules retrospectively corroborates the dissolution of the three-judge court, since plaintiffs assert — and defendants do not deny — that the increase still fails to bring Nassau County levels of payment up to those in New York City. Cf. the recent convening of a three-judge court in Rothstein v. Wyman, No. 69 Civ. 2763 (S.D.N.Y., July 7, 1969).
 
 
 107
 Moreover, my view is that the three-judge court should have decided the statutory question which concededly remained in the case before it. All of the reasons referred to in Part I of this opinion for the exercise of pendent jurisdiction by Judge Weinstein alone applied to the three-judge court. In addition, dissolution of the court allowed the argument to be made — and to be accepted — that the jurisdiction of the three-judge court had disappeared. It would have been quicker, simpler and more appropriate to the kind of pressing issues before that court if it had exercised its power to the fullest.
 
 
 108
 If I thought that the dissolution of the three-judge court completely divested Judge Weinstein of all jurisdiction then I would regard the decision to dissolve as an abuse of discretion and would dissent on that ground too. However, as Part I, supra, indicates, I do not attach that consequence to dissolution and, accordingly, need not go that far.
 
 
 
 Notes:
 
 
 [1]
 See, e. g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Kletschka v. Driver, 411 F.2d 436 (2d Cir., April 22, 1969)
 
 
 [2]
 That the state statute could be held unconstitutional in a declaratory ruling by the single judge seems settled. See ALI Study of the Division of Jurisdiction Between State and Federal Courts 245 (Tent.Draft No. 6, 1968), recommending that such a declaratory judgment require a three-judge court but noting:
 [T]he requirement is here extended to cases seeking only a declaratory judgment, a remedy which was unknown in 1910. Three judges are not now needed in such a case. Cf. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154-155, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); Flemming v. Nestor, 363 U.S. 603, 606-607, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).
 And see Currie, The Three-Judge Court in Constitutional Litigation, 32 U.Chi.L. Rev. 1, 13-20 (1964).
 
 
 [3]
 The basic and pendent claims "must derive from a common nucleus of operative fact," 383 U.S. at 725, 86 S.Ct. at 1138, clearly present in this case, e. g., the level of benefits before and after section 131-a and the relationship between benefits and need. The court has power to hear all of the claims if plaintiffs "would ordinarily be expected to try them all in one judicial proceeding,"id., assuredly the case here.
 
 
 [4]
 See Appellants' Application for a Stay of Further Proceedings in the District Court, June 13, 1969, at 2: The extraordinarily broad nature of the preliminary injunction in this case and the opinion of the Court below which supported it is such that every real issue in the case had been decided by the District Court and is presently before this Court
 
 
 [5]
 Actually, the state's direct monetary interest is even smaller, as local governments provide a substantial portion of the non-federal funds
 
 
 [6]
 In determining the amount of aid to be paid to a particular individual or family the state may, of course, take into consideration other income or resources of the recipient. See 42 U.S.C. § 602(a)(7), (8)
 
 
 [7]
 Thus, the brief notes:
 If a State last priced its assistance standard several years ago, and now is simplifying its standard as well as repricing it, question may arise whether the content of the new standard is equivalent to that of the old, and whether the elimination of items or the combination of items in the standard results in a contraction in the content of the standard that offsets in whole or in part the adjustment of prices to reflect changes in living cost. The second sentence of the regulation seeks to foreclose this possibility and to assure that the repricing will apply to at least the same scope of items as the previous pricing before January 2, 1968.
 * * * * *
 To adjust maximums on the one hand and to reduce them on the other would be an outright nullification of, and failure to comply with, the requirements of section 402(a) (23) [section 602(a)(23)], and would not constitute compliance with that section.
 
 
 [8]
 See Rosado v. Wyman, 304 F.Supp. 1356, 1376, 1377 (E.D.N.Y.1969). See also note 9,infra.
 
 
 [9]
 The dissenting opinion also carefully analyzed the legislative history of section 602 (a) (23) and concluded, as did Judge Weinstein, that though not voluminous the history of the section clearly evinced a Congressional intent that state AFDC payments be increased. 299 F.Supp. at 348
 
 
 [10]
 See also Williams v. Dandridge, 297 F. Supp. 450, 464 (D.Md., 1968), where the three-judge court noted in dictum:
 As it shows on its face, § 213(b) [section 602(a) (23)] was designed to increase benefits to keep pace with increased living costs.
 
 
 [11]
 Apparently both Louisiana and Texas formerly paid on a basis of 100% of their standards of need, subject to dollar maximums on the amount of aid to any family. After increasing its standards to comply with section 602(a)(23), Texas evidently reduced its percentage payment to 50%; Louisiana merely cut all grants by 10%, including those grants based on dollar maximums. See Lampton v. Bonin,supra, 299 F.Supp. at 348, 354 & n. 16.